## DANIEL DONNELLY *vs.* THE BALTIMORE TRUST AND GUARANTEE COMPANY.

*Fraud—Alleged Misrepresentations in Circular Relating to Street Railway Bonds—Statement as to Value and Earning Capacity of Property—Advice of Counsel—Action of Deceit.*

Defendant trust company was the agent of a syndicate which had consolidated the street railways and electric power company of Nashville and issued a circular offering for sale the bonds of the consolidated company. Plaintiff, who purchased some of the bonds, alleged that the circular contained certain false statements of fact which misled him to his injury, and brought this action of deceit to recover damages for the loss so occasioned. The first alleged misrepresentation in the circular was as follows: "We own and offer part of an issue of the first consolidated mortgage fifty-year 5 per cent gold bonds of the Nashville Railway." The circular showed the amount of the bonds authorized to be issued and the amount reserved to retire underlying liens. *Held*, that the obvious meaning of the circular was that the defendant's ownership of the bonds was as trustee, and since there is no evidence that the plaintiff was induced to make the purchase by the representation as to ownership, this statement is not a fraudulent misrepresentation.

The second statement relied on was: "Total mileage at present 66.2." *Held*, since the evidence shows that it is customary in stating the mileage of street railways to count double tracks as additionat mileage and also to include tracks owned but not actually used, this method of stating the mileage was not fraudulent.

The circular also stated that "the railway company is the sole owner of the capital stock of the C. Electric Light and Power Company and all of the shares of said company are deposited with the trustee as additional security for the bond issue." These shares were not in fact held in the name of the railway company, but they were held for its benefit by trustees, who were bound to pay to it all dividends and moneys received on account of the stock. Afterwards these shares of stock were sold by the trustees and the proceeds applied towards the payment of the bonds. Under these circumstances the variance between the statement in the circular and the actual facts does not sustain an action of deceit.

Another statement alleged to be false in itself and also because it suppressed the fact that the validity of the consolidation was attacked by pending litigation, was: "The company's charter is perpetual and the Chancery Court of Nashville has just decided that the franchises granted" to the N. Company are perpetual. "These franchises cover the largest and most profitable portion of the consolidated company's lines." A letter from the defendant's attorneys published with the circular stated that the Chancery Court of Nashville had declared to be perpetual the franchises of one of the consolidated companies which included 46 out of the total 66 miles. This letter was susceptible of the construction that the new company's charter was perpetual, and an opinion to that effect was given by the leading lawyer of Nashville. Defendant had been advised by its counsel that the Chancellor's decree was an end of the litigation respecting the consolidation. It was subsequently found that this was not the case. *Held*, that since this statement was made in reliance upon the advice of competent counsel it is not a fraudulent misrepresentation or concealment.

The circular, which was issued just before the census of 1900 was taken, stated that "the population of Nashville is now variously estimated at from 100,000 to 120,000." Since it is shown that different publications made the same estimate of population and it was only a matter of opinion, this statement is not fraudulent, although the census of 1900 showed the population to be about 80,000.

The statement in the circular as to the earning capacity of the combined companies and the estimate as to future earnings upon the consolidation were made upon the faith of the reports of several reputable consulting engineers, and although the consolidated company soon made default in payment of interest on the bonds, the statements as to gross earnings, operating expenses and fixed charges, are not shown to have been untrue at the time when made, and the estimate as to future earnings under the consolidation was only the expression of opinion, and consequently these statements in the circular do not constitute actionable fraud.

That a trust company which sells the bonds of a railroad company is an owner of stock in the railway and of some of the bonds is not a fact which imposes upon the trust company a higher duty in regard to the accuracy of its representations as a vendor than it would have if it did not hold such interest.

A false statement of fact made by a party honestly, with a belief in its truth, and relied upon by the party to whom made, is not such fraud as will support an action of deceit.

Appeal from the Superior Court of Baltimore City (Stock-bridge, J.)

The cause was argued before McSherry, C. J., Fowler, Briscoe, Page, Boyd and Pearce, JJ.

*John V. L. Findlay* (with whom was *Thos. Mackenzie* on the brief), for the appellant.

*John N. Steele* and *Edgar H. Gans*, for the appellee.

BOYD, J., delivered the opinion of the Court.

This is an action of deceit brought by the appellant against the appellee for alleged fraudulent misrepresentations in a circular issued by the appellee, offering for sale certain bonds of the Nashville Railway. There are sixteen bills of exception in the record, fifteen of which are concerning the admissibility of evidence, but as the first prayer offered by the defendant, which was granted by the Court, presents the most important questions in the case we will at once consider that. It instructed the jury that there was "no evidence legally sufficient to show that any of the representations alleged in the pleadings were made by the defendant to the plaintiff fraudulently, and therefore the verdict must be for the defendant."

In the early part of 1899 the attention of the appellee was directed to the street railway system in Nashville by Kountze Bros., of New York, and Hambleton & Co., of Baltimore, bankers of high standing in those cities. There were then in Nashville three street railway companies—the Nashville Street Railway, the Citizens Rapid Transit, and the Nashville and Suburban Railway. There was also a company known as the Cumberland Electric Light and Power Company, which in addition to furnishing electric light to the city and other customers, furnished power to the railway companies. After negotiations, a syndicate was formed in the early part of 1899, which purchased all the shares of stock of the light and power company, and all those of the railway companies, excepting the Nashville Street Railway Co., of which they purchased three-fourths or more. In the syndicate the appellee and Hambleton & Co. each had one-third interest, Kountze Bros. one-sixth and Messrs. McGee and Baxter each one-twelfth. In May, 1899, a company called the "Nashville Railway" was formed for the purpose of purchasing the three existing rail-

ways. Under the laws of Tennessee, street railway companies could consolidate, or be sold to each other, with the assent of the city and at least three-fourths of the stock of the companies interested. The assent of the city was not obtained at the time expected, and the proposed sale to the Nashville Railway was abandoned. On August 31st, 1899, an ordinance was passed giving the assent of the city to the proposed sale or consolidation, but on September 14th, 1899, the Mayor vetoed it. On September 19th, before the veto was acted on by the Council, W. T. Cooper and other citizens and taxpayers of Nashville, filed a bill to enjoin the City Council, the railway companies and the City Register. On the same day the Court refused to restrain the City Council, but granted a preliminary injunction against the railway companies and the City Register. On that evening the City Council passed the ordinance over the Mayor's veto. On the 23rd of January, 1900, CHANCELLOR COOK, of the Chancery Court of Nashville, dissolved the preliminary injunction, sustaining the contentions of the railway companies. Embodied in the decree is a statement that the complainants except and pray an appeal to the Supreme Court of Tennessee "which appeal the Court is of opinion does not lie and refuses to grant same, to which action of the Court in refusing to grant said appeal complainants except." On the day that decree was entered the railway companies were consolidated, by an "Agreement of Consolidation" entered into by them, "into one corporation by the corporate name of 'Nashville Railway.'" In that agreement it was provided that the capital stock of the Nashville Railway be fixed at $6,500,000 "to be issued as full paid, nonassessable stock to the owners of the said four constituent corporations as agreed upon." It further provided that the Nashville Railway issue $6,500,000 bonds of $1,000 each (to be secured by a mortgage or deed of trust) to the owners of the four constituent corporations, as agreed upon, for retiring the underlying bonds, for payment of expenses attendant upon the consolidation and for its general corporate purposes, but at least $1,651,000 of said bonds should be retained by

the trustee under the mortgage "for the construction or ac-
quisition of branch or additional lines, extensions, power
houses, betterments, property, equipment and other additional
property, including construction and alterations."    It also
mentioned the bonds which would remain outstanding against
two of the constituent corporations—there being no bonded
indebtness of the Nashville and Suburban Railway Company,
or of the Nashville Railway.    This agreement of consolida-
tion was approved by the stockholders of the respective com-
panies, was filed with the Secretary of State and seems to have
followed the method authorized by the laws of Tennessee,
provided the assent of the city is obtained.    At a meeting of
the stockholders of the four companies, held on January 23rd,
1900, the stock was directed to be issued; 64,989 shares to
T. E. Hambleton and John N. Steele, trustees, and one each
to eleven persons named, and a motion was passed for the
issue of the bonds to the appellee, and that $2,789,000 of
them be delivered to it, as agent for the owners of the stock,
bonds and properties of·the four constituent corporations in
part payment therefor, and for the payment of taxes and ex-
penses of the consolidation and other corporate purposes;
that $489,000 of them be held by the trustee to redeem the
bonds of the Light and Power Company and that the remain-
ing bonds, $2,060,000, be held by the trustee to take up the
bonds of the constituent companies, and the $1,651,000 be
reserved for construction, etc.

On May 4th, 1899, a sub-syndicate was formed which
agreed to take from the appellee, as agent of the original syn-
dicate, $2,300,000 of the whole issue.    When the stock of
the several companies was purchased by the syndicate the ap-
pellee advanced the money, and in December, 1899, the other
members of the syndicate paid it their portions—thus leaving
a one-third interest in the appellee at that time.    It was agreed
that the original syndicate was to have the $2,300,000 of
bonds at 87½, and the sub-syndicate at 94.    The appellee had
paid for the shares of the railway companies and of the light
and power company, which sum, together with interest,

amounted to $1,863,822.34, and also various items which are set forth in an account filed, amounting to $148,962.77, being a total of $2,012,785.11. It charged itself with the proceeds of the bonds at 87½, and sundry interest allowed on the balance, $285.11. It retained an interest in the bonds in the sub-syndicate of $75,000, and the evidence shows that all the members subsequently paid for their bonds, excepting one subscriber for ten or fifteen of them.

On the 29th of January, 1900, a mortgage was executed by the Nashville Railway to the appellee to secure the issue of the bonds. On the same day all the stock of the light and power company was deposited, duly endorsed in blank, under a declaration of trust, as additional security for the bonds, to be held by the trust company. On February 1st, 1900, the bonds ($2,300,000) were charged to the sub-syndicate, and in accordance with the agreement with the members of that, the appellee proceeded to sell them as its agent. All of the stock was issued, but $1,100,000 of it was put back in the treasury. Twenty per cent of the stock to the amount of the subscriptions by the sub-syndicate was given to its members as a *bonus*, and the balance was divided between the members of the original syndicate and some others. The appellee gave part of its stock to three trust companies, and had left about $466,000. On February 5th, 1900, the appellee issued a circular for the sale of the $2,300,000 of bonds, and on February 12th, 1900, the appellant purchased seven of them, paying par and accrued interest, less a commission of one-half per cent allowed him. The first coupon, due August 1st, was paid, but there was default in the payment of the one due February 1st, 1901, and none were paid afterwards. The company was placed in the hands of receivers in June of that year, a bondholders committee was appointed and the appellant sold his bonds at 78½ cents on the dollar. He now seeks to recover the difference, with interest. The bondholders committee sold the bonds controlled by them to another syndicate for 80 cents on the dollar, deducting one and one-half per cent for expenses. As the alleged false representations were

made in the circular spoken of we will consider them in the order they there appear.

I. The first is : "*We own and offer part of an issue of the first consolidated mortgage 50-year 5 per cent gold bonds of the Nashville Railway of Nashville, Tennessee.*"   We find nothing in the evidence of Mr. Donnelly suggesting that he thought that the appellee was the actual owner, *in its own right,* of all the bonds to be sold, or that this statement in any way influenced him to make the purchase.   He was a member of the finance committee of the Metropolitan Savings Bank of Baltimore and could not have supposed from that circular that the trust company was the owner of *all* the bonds.   He was allowed a commission of one-half per cent and would not likely have thought that the appellee was paying him a commission for buying its own bonds.   He must have known that the circular meant that the appellee's ownership was as trustee and that it had the sole control of the sale of the bonds. Surely Mr. Shriver, who dealt for him and talked with him over the purchase of some of the bonds for the bank, would, as the president of a bank, understand what that part of the circular meant.   Mr. Waring, president of the Central Savings Bank, and also a member of the executive committee of the appellee, testified that in his opinion the statement was true that, "they were the representatives of the syndicate that owned the bonds.   I think that is the usual and customary way of stating it."   Messrs. Davidson, David Ambach and Eugene Levering testified to the same thing in substance, and there is not only no contradiction of their evidence on the subject, but they were called by the appellant and examined in chief as to this statement.   The appellee had the legal title to and the possession of the bonds, and as a member of the sub-syndicate did in fact have a beneficial interest in part of them. In the discussion of another question the appellant's brief says "There is nothing on the face of the instrument itself" (referring to the mortgage) "or in the circular to suggest that the defendant was not an *indifferent party, without relation to or connection of any kind with the railway, except as the trustee*

*under the mortgage,*" the latter part being italicized in that brief. It is difficult to understand how that statement can be reconciled with the contention of the appellant on the point now under consideration.

The reference to these bonds as an issue of "the *first* consolidated mortgage" is also criticised, but there is no evidence that there was any other consolidated mortgage. The circular shows on its face the amount of bonds authorized and the amount reserved "*to retire underlying liens.*" There was therefore actual notice to purchasers that there were $2,549,000 of underlying liens on the property which was to be provided for out of the issue, and the balance to be sold was ascertained by deducting from the total issue those reserved to meet the liens already existing, and those held for future extension, etc. The point made that there was in fact no security in the properties acquired, beyond the liens already existing, will be considered under another branch. There is nothing in the first alleged misrepresentation that could support an action of deceit.

2. The next representation complained of is as to *the mileage.* The circular states that of each of the three railways, concluding, "total mileage at present 66.2." We find nothing whatever in the record to show that there was not that number of miles of track owned by those companies. It is true that there were not 66.2 miles of streets in the city of Nashville occupied by them, but there is no contradiction of the evidence that if there are double tracks of a railway in a city, distant one mile from one point to another, the mileage is counted as two miles. Such being the testimony, how could any one making such a statement be held guilty of fraud, for that reason, in making it? If, as the witnesses say, it is the usual way of stating the mileage of a street railway it is the proper way to describe it.

It is also said that some of the tracks were useless, and some actually not used. But surely that would not require them to be left out of the statement to avoid the charge of fraud. Any consolidation of street railway companies may

make some tracks of little or no use to the consolidated company—at least for the present—by reason of there being parallel roads or other cause. But in addition to the material in them, the franchise to use or control such streets, or the future needs of the company, may make them valuable. Whatever policy the new company might adopt as to the use of some of them, a purchaser of bonds should not expect it to leave out of a statement of tracks actually in existence such as might be deemed undesirable or unnecessary. The condition of the road will be considered later.

3. The circular states "*The railway company is the sole owner of the capital stock of the Cumberland Electric Light and Power Company, and all of the shares of said company are deposited with the trustee as additional security for the bond issue.*" That company's bonds are provided for, and every one of its 3,400 shares of stock was purchased by the syndicate. It is true that the railway company was not *technically the owner* of the stock and the laws of Tennessee prohibit a street railway company from owning the stock of such a company. Mr. Davidson testified, when examined by the appellant on the subject, that when he prepared the circular he had overlooked that fact, but there can be no doubt that the railway company was *substantially* the owner of the light and power company, in so far as the question of ownership could possibly affect the value of the bonds offered for sale. The statement that all of the shares were deposited with the trustee was true, and after default was made by the railway company all of them were sold, and the proceeds applied towards the payment of these bonds. After they were purchased by the syndicate 3,390 shares were placed in the name of trustees, who on January 29th, 1900, the date of the mortgage, made a declaration of trust reciting that they deliver and pledge the said stock to the appellee, "To hold the same for the benefit and security of said bonds issued by the said Nashville Railway and secured by said deed of trust or mortgage * * * under and upon the same terms, trusts and conditions, as are set out in said deed of trust." It then gave the appellee full

power to sell them in case of default.   It recited that the board of directors of the Nashville Railway had power and authority to remove either of the individual trustees, and to fill vacancies, and the trustees covenanted and agreed with the railway that, subject to the pledge made to the appellee, they would hold the stock "for the benefit and subject to the direction of the board of directors of the said Nashville Railway," and that until default in the bonds they would pay over to it "all dividends and moneys that may be received by them for or on account of the said stock." They endorsed the certificate of stock in blank and turned it over to the appellee. The remaining ten shares of stock, which were held by the directors of that company to qualify them as such, were likewise turned over to the appellee subject to the same conditions as the others.   Without further comment on these facts, which are not attempted to be denied, it is impossible for us to see how the variance between the statement in the circular and the actual facts could be made the foundation of an action of deceit—the only difference being that instead of the shares being in the name of the railway company, they were held *for its benefit by trustees* of its own selection, with an express covenant on their part to pay over to it "*all dividends and moneys* that may be received by them for or on account of the said stock." It is clear that the bondholders in fact got all the benefit of the stock that they could possibly have had, if the Nashville Railway had held it in its own name.   The circular did not pretend that the mortgage was a lien on the property of the light and power company, but expressly stated that it was confined to the three railway companies, and only claimed that the shares of stock of the light and power company were deposited with the appellee as additional security, which is not only not denied but proven by the appellant to be true.   We will refer to the earning capacity of this company in connection with that of the railway companies when we reach that branch of the case.

4. The next statement complained of is as to the "*Perpetual Charter.*" The circular under that head states "The company's

charter is perpetual, and the Chancery Court of Nashville, Tennessee, has just decided that the franchises granted by the city to the Nashville Street Railway, and which under the consolidation are now vested in the Nashville Railway are perpetual. These franchises cover the largest and most profitable portion of the consolidated companies lines." It is contended by the appellant (*a*) That this representation was false, to the knowledge of the defendant, and (*b*) That it was false by reason of the suppression of the fact that there was then pending litigation, which assailed the validity of the consolidation, of which it either had actual knowledge, or must under the cir‑ cumstances be held to have had knowledge. As these two questions are more or less interwoven we will consider them under the same general heading. Mr. Donnelly testified that this statement had some effect on him. But was it a false statement, made without justification, in such way as to make the appellee liable in this action? The appellant could not have been deceived as to what the appellee relied on for its statement in reference to the decision of the Chancery Court and the franchises of the Nashville Street Railway. The letter from the attorneys was published as part of the circular and it stated that the Chancery Court had so decided, and we do not understand it to be denied that such was the decision of that Court. As the Nashville Street Railway Company's tracks were 46.9 miles, out of the total mileage (66.2), its franchise did cover the largest and, the evidence shows, the most profitable portion of the consolidated companies lines. Mr. Donnelly said in answer to the question whether the statement about the Court's decision had its effect upon him, "It might have had some slight effect but I didn't pay much attention to that."

The letter of the attorneys, after stating that the Nashville Railway was properly and lawfully consolidated, added "that by virtue of such consolidation it is possessed of all the franchises and properties of its constituent corporations, and that it has the legal right to exercise and carry on said franchises," and concluded by saying: "The franchises of the Nashville

Street Railway, which was the largest and most important of the consolidated companies, have been recently declared by the Chancery Court of Nashville to be perpetual." Mr. Davidson testified that he understood from that letter that what he said in the circular was true—that the company's charter was perpetual. Any layman might well reach that conclusion, and surely when the circular included the written opinion of the attorneys, on which Mr. Davidson based his conclusion if the appellant reached the same conclusion, with the letter before him, he cannot justly accuse the appellee of fraud because its president had the same understanding of the opinion that he had. His testimony shows that he did read the opinion and when read in connection with the statement in the circular he could not well have misunderstood what was meant, unless he made the same mistake Mr. Davidson did.

But that is not all. Mr. Bradford, of the Nashville Bar, who is shown to be at the head of his profession in that city, testified that in his opinion under the laws of Tennessee the charter was perpetual. It is true he was called by the defendant, but there is nothing in the record to contradict him, and if that was not the law of Tennessee the appellant ought to have so shown, if he desired to question it. We do not understand the decision of the Court of Chancery Appeals to be contrary to that. It held that the consolidation was void because the ordinance had not been complied with, but it did not hold, or say in the opinion of the majority that if the consolidation had been valid it would not have been perpetual—at any rate that opinion was not delivered until two years after the plaintiff purchased his bonds. The attorneys for Baltimore who represented the appellee and those associated with him are amongst the leading lawyers of that city, and are of such standing and character as would unquestionably cause a client to act on their opinion. Is it to be said then that when a client makes a statement based on the opinion of reputable and competent attorneys, as he understands it, a copy of which is inserted in the document in which the statement is made, his act is to be declared *fraudulent*, even if it be admitted that

he was mistaken in his construction of the opinion? It would seem to be clear that it could not be so declared—at least not unless the opinion was not open to the construction he placed on it, which we have intimated above was not the case. This Court has in substance stated the same doctrine a number of times, but the latest expression by it is in *Boulden* v. *Stilwell*, 100 Md. 543, where it is said "The foundation of the action is actual fraud, and nothing short of this will suffice. Consequently a misrepresentation believed by the speaker to be true, though induced by his ignorance or negligence, will not sustain an action for deceit. There must be either knowledge of the falsity of the representation, or such reckless indifference to truth in making it as is held equivalent to actual knowledge." See also *Cahill* v. *Applegarth*, 98 Md. 493, and cases there cited. Of course the law does not excuse a person in all cases merely because he relied on the opinion of his attorney, but he is not liable in this form of action—which has as its basis actual fraud—when he has acted on the opinion of his attorneys in making a statement, if he did so honestly. In *Derry* v. *Peek*, 14 App. Cas. 337, Lord Herschell thus explained what is meant by a statement made recklessly or without care: "To make a statement *careless whether it be true or false, and therefore without any real belief in its truth*, appears to me to be an essentially different thing from making, through want of care, a false statement, which is nevertheless honestly believed to be true." So, without further discussion of it, we are of opinion that there was not legally sufficient evidence tending to show fraud in this representation to justify the submission of it to the jury.

It is contended however that the suppression of the fact of the pending litigation was fraudulent. It is a peculiar fact that there is not a particle of evidence to show that the litigation was in any way responsible for the default of the Nashville Railway. That first occurred in February, 1901, and as late as August 23rd, 1901, Chancellor Cook passed a decree dismissing the bills of complaint, including those filed on or after February 10th, 1900. He sustained the Nashville Rail-

way's position and it was not until August, 1902, that his de-cision was reversed.    It is not only necessary that the representation relied on be false and fraudulent, but "there must be damage directly resulting from the fraud." *Boulden* v. *Stilwell*, *supra*.    The appellant's proof as to what caused the damage which he sustained, goes mainly, if not exclusively, to the condition of the property, and the exaggerated statements of the appellee about it, which will be considered later.    The Nashville Railway had been put in the hands of receivers in June, 1901, and long before the decision of the Court of Chancery Appeals they had been authorized to expend large sums of money.    The Nashville Railway at once took an appeal from that to the Supreme Court of the State, and five or six weeks after the decree of the Court of Chancery Appeals was entered a decree was passed by the Supreme Court, by agreement of all parties, fully securing to the railway all necessary rights.    The appellant did not sell his bonds until after that decree was passed, and the loss he sustained on them cannot fairly be said to be the result of the litigation, as that was settled.

But aside from that, the circular showed on its face there had been some litigation, as otherwise the Chancery Court could not have decided that the franchises granted the Nashville Street Railway were perpetual.    Anyone of ordinary intelligence and prudence would have known that from the circular itself, and the litigation that was ultimately decided against the railway company was not commenced until February 10th, 1900, the circular was issued on February 5th, the appellant made his purchase on the 12th, and the evidence shows that Mr. Davidson did not know of the new litigation until February 15th.    He had been advised by his counsel that the Chancellor's decree was an end of the litigation, and in addition to the opinion of Messrs. Steele, Semmes, Carey and Bond, who were the appellee's regular counsel in Baltimore, he was advised by the late JUDGE FISHER of Baltimore, and by his Nashville attorneys that the company was legally and properly formed.    After the litigation was begun the counsel assured

him that it would result favorably, and as Mr. Eugene Levering, one of the executive committee, said, "The advice we got was there was nothing to fear, that certainly it would not injure any interests of the company." Messrs. Ambach and Waring, other members of the committee, testified to the same effect. People dealing with a company like the appellee must know when it refers to such questions as the rights, franchises and privileges of corporations, whose bonds it is selling, that it must rely on its attorneys, and when it acts on such advice in the belief that they are right, the law of this State has not yet gone so far as to hold that its officers are guilty of fraud, even if it is afterwards ascertained that they were mistaken, which is at least doubtful in this case, as the question was never determined by the Court of last resort in Tennessee, excepting by the compromise decree. We of course do not mean to intimate that parties are in all cases excused simply because they follow the advice of counsel, but when the question is whether there was a fraudulent suppression of an alleged fact in the sale of bonds, if any value is to be given to the opinion of reputable and competent counsel in any case, surely the assurance of such counsel that the litigation was ended, or that such as was pending could "only result in favor of the bonds" ought in the absence of some proof, other than the mere omission to call attention to the litigation, acquit the party of a fraudulent suppression of the fact. In *Kountze* v. *Kennedy*, 147 N. Y. 124, the president of the company in making up a statement of its assets and liabilities, to submit to the plaintiffs in his effort to induce them to purchase bonds and stock of the company, omitted an item from its liabilities of several hundred thousand dollars, *of which he was aware, but which he had been advised by counsel was not a valid claim.* A suit was then pending for it, and it was afterwards established by judgment. In an action for a deceit based on that omission the Court held that "if the non-disclosure was attributable to an honest belief that the claim was not valid and could not be enforced, the fraudulent intent is lacking and the charge of deceit false." See also in *Derry* v. *Peek, supra,*

LORD BRAMWELL's statement about the directors therein re-
ferred to trusting to their solicitors.

We cannot adopt the suggestion of the appellant that be-
cause Mr. Bradford had some interest in the original syndi-
cate, and Mr. Steele had some in the sub-syndicate, their
advice ought not to have been accepted, on a question of this
kind.   In the first place the proof is that it was not known to
the appellee that Mr. Steele had any interest, but, regardless
of that, it cannot be assumed that reputable attorneys would
permit such interests, as are shown in this case, to in any way
interfere with the honest and proper discharge of their pro-
fessional duties, and in the absence of some evidence to
show they have, juries should not be permitted to speculate
on it.

5. We will pass for the present the question about the earn-
ings of the company and will briefly refer to the statements
about the *population* and *trade* of Nashville.   It was stated in
the circular that "The population is now variously estimated
at from one hundred to one hundred and twenty thousand—
the post-office receipts being the basis for the latter estimate."
When the circular was issued the census for 1900 had not
been taken.   Mr. Davidson testified that he had a copy of a
street railway supplement of the "Commercial and Financial
Chronicle" of August 26th, 1899, and that was offered in evi-
dence.   It stated "Nashville, Tenn.; population in 1897, esti-
mated at 125,000," and then stated that of some other years.
He also said he had what is spoken of as a "folder" which
speaks of supposed advantages of Nashville, and amongst
other things it gave the population for every ten years, begin-
ning with 1830, and stated "The population is now variously
estimated at from 100,000 to 120,000.   The post-office re-
ceipts are the basis of the latter estimate."   The secretary of
the Chamber of Commerce at Nashville testified in chief that
the census of 1900 showed the whole population of the city
to be about 80,000.   He said on cross-examination that he and
most of the citizens of Nashville were disappointed at the result
of the census—that before it was announced the population was

thought to be from 95,000 to 100,000 for Nashville proper, and including the suburbs outside the city from 110,000 to 115,000. So without further discussion of that it is manifest that there could be no possible ground to sustain fraud by reason of that statement. That question was not only open to the appellant to satisfy himself about but no one could be deceived by it. It was at most "an expression of opinion as to the subject of the statement" which is not a ground for this action. *Boulden* v. *Stilwell, supra.*

It also stated "As the population of the city has grown, the trade has increased in like proportion, so that now the whole-sale trade of the city is valued at more than one hundred million dollars annually." The folder spoken of says *"Nash-ville's Trade.* Valued at more than $100,000,000 annually." The secretary of the Chamber of Commerce said the whole-sale trade for 1900 was $52,500,000 approximately, and that the business done was $72,750,000. Assuming his statistics to be correct, the statement in the circular was exaggerated, but it is not suggested in the evidence that Mr. Donnelly or any one else was injured by that. But if it had been, it would be a very slight foundation for a verdict, which has as its result a stain upon the character of reputable men, such as those composing the executive committee, by branding them as parties to a fraud, to say nothing of the man who actually wrote the circular.

6. We will now consider the question of the *"Earning capacity of the combined companies including the electric light plant,"* and in connection with that the condition of the properties, and other matters that can be conveniently discussed under this head. The circular gives what purports to be the actual earnings *from April 1st, 1899, to January 1st, 1900,* less operating expenses. From that is deducted the proportion of interest on underlying liens and taxes for that period, leaving as "Net surplus, actual result of nine months operation before consolidation, $110,733.95." It then gives the net result for the current year, upon that basis, and "Add conservative estimate of the savings under consolidation, as

per engineer's report herewith, $61,694.73," and concludes
by "Estimated net result applicable to interest on $2,300,000
bonds, and dividends on stock, $209,340.". Immediately fol-
lowing that, and headed "*Engineer's Estimate*," is a letter of
Mr. Janon Fisher, civil and consulting engineer, giving those
results.   The only difference is that he adds the taxes to op-
erating expenses, giving the same amount as the net surplus,
and then gives his estimate of the next five years operation
of the combined properties, showing the net results applicable
to dividends on stock.   For 1900 he made the latter $94,340,
which added to the $115,000 of interest amounted to $209,340,
which is stated in the circular.   He concluded by saying "*I
consider these estimates conservative and believe you can safely
recommend the bonds of this company as an unusually attractive
investment.*"

Great reliance is placed on this alleged misrepresentation,
and it is perhaps the most material question to be decided.
It is contended that the appellee knew that this statement was
false, and that if it did not it did not have any reason to be-
lieve that it was true, and issued it with a reckless disregard
of whether it was true or not, with the fraudulent design to sell
the bonds to whomsoever it could impose upon.   A good
deal of the evidence and of the argument, both oral and on
the briefs, was directed to showing that in point of fact the
real conditions were utterly at variance with those represented.
Of course, proof of that mere fact would not be sufficient to
sustain this action, but as reflecting upon the question of act-
ual fraud, *vel non*, it is proper to ascertain what was done by
the party accused of fraud, what his means of information
were, etc.

On *February 18th, 1899*, F. W. Child made a long and ex-
haustive report to the appellee "and associates" on the rail-
ways, and, as of the same date, one on the light and power
company.   He was then in the employ of Kountze Bros., al-
though not so when he testified, and his duties were to make
examinations of street railways and electric light properties
offered to the firm.   He was familiar with such properties and

had had large experience.    He went to Nashville and made what appears to be an exceedingly thorough investigation and his reports were the result of them.    He went into the general history of the companies, the underlying bonds, various securities, the mileage, the real estate, buildings and equipments, weight of rails, and many other details—his report on the railways taking twenty-eight pages of the printed record. Amongst other things, he said "My general conclusions are that the city of Nashville is a growing city and its railroad business will steadily increase.    The present system of trackage is well distributed, a remarkable absence of unprofitable trackage.    *Its general physical condition is very good.*    While 35 lb. T rails are largely in use, the fact that the city is built on rock insures especially good foundation, and as all streets are well paved with block or macadam, *under these conditions a 35 lb. rail is sufficiently heavy, though not up to present practice.*"    After referring to the good management of all departments, repairs being kept up and other things, he concluded by saying "I do not see where more than $60,000 could be spent in betterments to advantage and with say $15,000 allowed per annum for track renewals, is all that should be spent on betterment account for at least five years.    The earnings can be greatly increased by having 20 more cars as suggested, *and I estimate that with the addition of the other two lines and additional rolling stock, at least $100,000 can be added to the gross receipts.*"    He accompanies his report with a detailed statement of earnings, certified to by Mr. Yeatman, the secretary and treasurer of the Nashville Street Railway Company, showing net earnings for 1895 to be $135,277.20, for 1896 $156,363.36, for 1898 $181,521.03, and for 1897 $268,677.79—the latter being abnormal by reason of it being the centennial year of Nashville.    He also reported the net earnings of the Citizens Rapid Transit Company to be $15,370.73, and estimated that if it was operated by the Nashville Street Railway the same gross earnings would realize $21,408.96 (about 40 per cent increase) to be applied to interest.    He gave no estimate of profits by the Nashville and Suburban Street Railway.

His report on the light and power company was likewise thorough, covering eight pages of the record, giving detailed statement of the buildings, engines and boilers, dynamos, machinery, etc., and represented the properties to be in good —much of it in *excellent*—order. He reported that the earnings for 1898 were $191,000, operating expenses $108,000, and after payment of interest on liens and taxes there was a net surplus of $41,827.25. He did not make any estimate in his report of the money necessary to be expended on the light and power company's property, and explained in his testimony the reason as follows: "I did not consider that it was necessary to spend any money at that time upon this property, beyond the yearly maintenance costs which were charged into the operating and maintenance account of the property."

About the time Mr. Child made his report Hambleton & Co. submitted to the trust company a report of A. W. Swanitz, a consulting engineer of New York, to the Atlantic Trust Company of that city, which was trustee in a mortgage from the light and power company. Mr. Swanitz was an educated engineer of large experience and had been connected with various companies in Chicago, New York and elsewhere. His report, which is dated *January 19th, 1899*, shows that he made a thorough examination. After referring to the good condition of the properties, machinery, etc., he added, "In fact, it was apparent to me that the entire property is in good condition such as would naturally result from good management by able and experienced superintendence." He found that the increase of plant during 1898 cost $23,447.64. He said the total valuation of the plant charged on the books of the company was $840,782.80, but his estimate as of that date was $601,500. The only criticism he made was the variety of engines, boilers and electric generators, as a more economic plan would have suggested that all of the engines, boilers, etc., be of the same make.

On *February 25th, 1899*, an option was given Hambleton & Co., for themselves and associates (the proposed syndicate) by F. S. Pratt of Nashville, by which the latter agreed to deliver

by March 25th, certain shares of the light and power company, and in the agreement there is a statement of the gross receipts, operating expenses, interest, insurance and taxes for years 1896, 1897 and 1898—showing net earnings of $45,227.56, $73,243.50 and $59,073.26 for those respective years. In the early part of 1899 Mr. Yeatman, secretary and treasurer of Nashville Street Railway, examined the books of the light and power company and found they corresponded with the statement in the option, excepting one clerical error of $5,280.00.

On *March 17th, 1899,* J. J. Pryor, an accountant at Nashville, made a report to Thos. J. Felder, vice-president of the Nashville Street Railway Company, which corroborated the statement of Mr. Yeatman, filed with Mr. Child's report.

*These various reports were submitted to the appellee,* and they also received much information from the Messrs. Hambleton, Felder and others. It certainly cannot be presumed, and would hardly be suggested, that the appellee and others connected with it were not up to this time making thorough and honest efforts to ascertain the true condition of the properties, as they were making the investigations to determine whether they would invest their own money in the enterprise, and as a result of it all did actually invest in the neighborhood of two million dollars. However ready parties may be to take advantage of others, they are not likely to *knowingly* or *intentionally* invest such a sum of money in worthless properties— certainly not for the bare chance of realizing any such profits as they were limited to in this enterprise. It can therefore be fairly assumed that up to this point it was deemed to be a proper and reasonably safe investment.

*After the syndicate obtained control, in the spring of 1899,* the secretary made monthly reports of the earnings and expenses of the various companies, and Mr. Davidson swore "They showed a constantly increasing earning capacity of the company," although the roads were not yet consolidated. In the report of the secretary of *June 19th, 1899* (which was from May 1st, 1898, to May 1st, 1899, except the Citizens Rapid Transit, which was from January to January), he showed net

surplus, after paying operating expenses, interest on bonds, taxes and insurance, as follows:    Light and Power Company, $55,658.90; Nashville Street Railway, $44,482.48; Citizens' Rapid Transit Company, $10,275.98, and Nashville and Suburban Railway, $2,529.71, which amount in all to $112,947.07. Mr. Davidson also swore that after the syndicate got control "we were constantly in communication with Mr. Hambleton and with Mr. Felder, and Mr. Child, and their reports were that the physical condition of the property was being improved and that the net earnings of the property were being devoted to its physical improvement."

On *November 30th, 1899, about two months before the circulars were issued*, E. G. Connett, general manager of the companies, made a written report to Mr. Warner, assistant treasurer of the appellee, for the six months ending October 30th, 1899, in which he stated the gross earnings and operating expenses, leaving a balance of $185,101.77 of net earnings. He then said:    "Using these figures as a basis, which I consider fair and conservative, the result for the year would be as follows," making an estimate of net earnings for the year of $370,203.54, from which he deducted, as fixed charges, interest on the different bonds of the two railway companies which had bonds, and on those of the light and power company, taxes estimated at $60,000, insurance, *interest on the new bonds*, making total fixed charges $324,240, and leaving a surplus of $45,963.54.    He said the estimate on taxes was a maximum, and would perhaps be less, and added, "If the improvements and service arrangements which I have proposed and recommended are allowed, together with the natural increase of growth of business, will doubtless increase the gross earnings beyond my estimate and will yield a surplus of $100,000 to $150,000 during the next calendar year."

*These reports and estimates did not include the light and power company*, but only the railways.    Mr. Connett is shown to be a thoroughly competent man, and was general manager of the Nashville Street Railway from its organization.    He was not in the employ of the company when he testified—having

left it April 1st, 1900—but he corroborated his statement, made in the above communication, and said he was in thorough accord with the recommendation of Mr. Child—especially that it would only require an expenditure of $15,000 per annum for at least five years for track renewals and taking care of them.

The consolidation took place January 23rd, 1900, as shown above. Mr. Felder sent to Mr. Davidson the statement of the secretary and treasurer of the gross receipts, operating expenses, and fixed charges, from April 1st, 1899, to January 1st, 1900, which the secretary and treasurer certified to be "a true and correct statement." But before issuing the circular Mr. Davidson sent to Nashville for investigation Mr. Janon Fisher, a son of Ex-JUDGE FISHER, who was a civil engineer, had had experience in the management of railway properties, had been president of a system of railways in Norfolk, Virginia, had been City Commissioner of Baltimore, and Mr. Davidson said "he was a man upon whose judgment I could rely with confidence and I did so rely." Messrs. German H. Hunt, Eugene Levering, Robt. K. Waring and David Ambach, of the executive committee, all of whom were called as witnesses by the appellant, testified to the same thing in substance about Mr. Fisher. We have stated above enough of Mr. Fisher's report published with the circular to show the substance of it, and will only add that it fully verified the statement of the secretary and treasurer forwarded by Mr. Felder to the appellee.

We have thus given a summary of the more important facts bearing on the character of investigations made, the sources of the information obtained, the conclusions reached by the president and executive committee of the appellee, and other circumstances connected with the representations in the circular as to the earnings in the past, and the prospects of the consolidated company. It is difficult to understand how any company proposing to sell bonds could do more to fully inform itself, and if the appellee is to be held guilty of a fraudulent misrepresentation of the earning capacity of these com-

panies, by reason of what is in this circular, no company or
individual, engaged in selling securities of corporations, can
venture to state the result of their past operations.  In the
first place there is no *evidence* whatever that the statements of
gross earnings, operating expenses and fixed charges were not
true.  They are not only not proven to be untrue, but they
are shown affirmatively to have been true, and for the most
part so shown by evidence produced by the appellant.  We
will not stop to discuss the question as to how far a party is
bound by the evidence of adverse witnesses called by him,
when he offered other evidence in contradiction of it, for on
the most material points concerning these earnings stated in the
circular there has been no attempt to meet them with other
evidence, but only by inferences, insinuations and ultimate re-
sults in the experience of the company at a later period.  As
the appellant did make these persons his own witnesses, the
Court cannot simply refuse to believe them and assume that
because some witnesses testified the properties were in bad con-
dition, or because the Nashville Railway failed in 1901, there-
fore it cannot be true that the earnings from April 1st, 1899,
to January 1st, 1900, were not as stated.  But if they were
not, surely the appellee was justified in believing they were,
if the uncontradicted evidence in the record as to the investi-
gations made, reports received, etc., be given its legal effect.
The appellee did not rely entirely upon the reports of the offi-
cers of the companies as to what the gross receipts, operating
expenses and fixed charges were (and if they had, it could
scarcely be claimed to be evidence of fraud), but capable ex-
perts were sent to Nashville and made thorough investigations.
Of course it is possible that false entries could be made in the
books, but there is no suggestion of such in the evidence, in
the case of any of these companies, or, if there were, that the
appellee knew or had any reason to suspect them.  The ap-
pellee was not only informed as to the properties when the
purchases were made by the syndicate but continued its inves-
tigations to the very time it issued the circular.  We are there-
fore at a loss to know what more could be done by a corpor-
ation, which must act through agents.

So far as the estimates for the future are concerned, they only profess to be *estimates.*    It is true the circular says *"conservative* estimate," but that is precisely what Mr. Fisher said it was and the circular showed on its face that it was "per engineer's report herewith."    Mr. Connett just two months before has said his estimate as to the earning capacity for the year, was *"fair and conservative,"* and Mr. Davidson, Mr. Hunt and others said they believed the reports were correct, and the fact that the circular made the recommendation to purchase in *red ink* can hardly be said to give false color to the transaction.    Mr. Davidson explained how he obtained the $61,694.73, which is perfectly apparent.    Whether or not Mr. Fisher was right in his estimate as the result of consolidation, assuming there would be proper management, it cannot be denied that the parties would expect to save by consolidation, and of course they contemplated improvements that would increase the earning capacity of the companies. If therefore parties have the right to rely on the judgment of men they have every reason to believe are competent and reliable and have investigated a subject, it would seem that Mr. Davidson and the members of the executive committee were fully justified in accepting the estimates of these gentlemen. But if there could be any doubt about that, the law is thoroughly settled as to the effect of stating estimates.    We need only quote again from *Boulden* v. *Stilwell,* where it is said "It must be a statement of an alleged existing fact or facts, and not merely of some future or contingent event, or an expression of opinion as to the subject of the statement."

We are not unmindful of the fact that there is some evidence in the record tending to show that some of the railway tracks and the light and power plant were not in the condition shown by the reports we have referred to, and some of it goes to the extent that they were in bad condition.    Nor do we forget that when there is a relevant question of fact in controversy that it is generally for the jury, and not the Court, to pass on.    But there is not a suggestion in the record that the views of any of the witnesses testifying to such physical con-

ditions of the properties were known to the appellee, or any of its officers, before the bonds were sold, or that they had any reason to suspect that such conditions existed. On the contrary we have shown that they had every reason to believe the opposite and those examined who were connected with the transaction have sworn they did believe it. Even if the appellee could be held responsible for *negligence*, which it could not under the doctrine stated in *Cahill* v. *Applegarth* and cases there cited, there is no evidence of that as the testimony shows it did all in the way of informing itself that could be required of any company or individual, unless the law is to impose on one situated as the appellee was duties that would be practically impossible to perform, which the law never does.

There is nothing in the circular referring in terms to the physical condition of the properties, but it is contended that it was such as to require all the surplus earnings over and above the taxes, insurance and interest on underlying bonds, to keep the properties in an efficient condition to be operated. There is certainly no direct evidence that goes to that extent. The fact that the original syndicate paid in the neighborhood of $150,000 of floating indebtedness, due by the companies when it made the purchase, out of the money it paid for the bonds, certainly does not show that the net surplus stated in the circular was not earned from April 1st, 1899, to January 1st, 1900, as all that period was after the purchase. That net surplus was not needed for interest on the new bonds, as they were not issued until February, and no interest was due until August, and if every dollar of it was used in betterments and improving the property no one could complain. It would have been a rather unusual condition of affairs if none of those companies had any floating indebtedness when the purchase was made, but what there was was paid out of the proceeds of these bonds and did not affect purchasers of them. The debentures of the Nashville Street Railway were also paid out of those proceeds. Every intelligent observer must know that an electric railway or electric light company may require large and extraordinary expenditures at times. Expenses for

damage suits, new rails, cars, wires, engines, boilers, electrical appliances, etc., will be incurred, and sometimes very unexpectedly—the explosion of the boiler in the fall of 1900, for example. There can be no legitimate inference against the appellee from the fact that when the receivers took charge in June, 1901—sixteen months after the bonds were sold—they were required to expend large sums of money. If it be true, as indicated in the evidence, that the companies were badly managed after the consolidation, it would not take long to get the properties in a much worse condition than they were in January or February, 1900. The testimony shows that no property will deteriorate more rapidly than that of an electric railway or electric light company if neglected, and improvements are constantly being made in electrical appliances. Nor does the default in the payment of interest, in February, 1901, prove that what the appellee said in February, 1900, was not true. . The Trust Company did not undertake the guarantee proper and successful management, but it stated facts as to what had been done in the past and gave its opinion, based on them, of what could be done in the future. The reports of the receivers undoubtedly show that some of the properties of the railway and of the light and power company were in bad condition when they took charge, and large amounts were authorized to be expended by them. It is somewhat difficult to ascertain from the records just what all of the money expended by them was used for, but it is shown that a great deal of it was for improvements and the acquisition of new property, which ultimately greatly benefited the company, and a large part of it was for expenditures the appellee had no reason to anticipate.

A strong circumstance to show that the predictions of the appellee were not wholly unfounded is the actual result of the work of the new company. The Nashville Railway and Light Company, the present owner, was organized in June, 1903 It spent over $1,100,000 to April 1st, 1904, in what is called "construction and re-construction," but it built a steam plan which cost one-fifth of that sum, spent in real estate, buildings

and fixtures over $133,000, in the purchase of cars and electric equipment of cars over $117,000, in an electric generating plant and lighting overhead system $84,000, and made other improvements that were not absolutely necessary but doubtless desirable and beneficial to the company, or at least supposed to be. The capitalization of that company was: Bonds issued, $2,423,000; in escrow, $2,577,000; in treasury, $1,000,000—total, $6,000,000; stock, preferred outstanding, $1,995,500, in treasury, $504,500; total of preferred, $2,500,000; common outstanding, $3,500,000; in treasury, $500,000; making $6,500,000 in all. The bonds issued and in escrow amounted to more than those issued and held by the trustee for underlying bonds in the case of the Nashville Railway. Whether those in escrow were held for underlying bonds is not shown, but the amounts are near the same, and at any rate nearly $2,000,000 of preferred stock was issued and notwithstanding the amount of bonds and preferred stock of the new company, the evidence shows that on October 28th, 1904, the day before the witness testified, the common stock sold at 36¾ and 37, and there were bids of 86½ for the preferred stock and 99½ for the bonds, but they could not be furnished at less than 87 for the preferred stock, and par and a quarter for the bonds. It will thus be seen that the capitalization of the Nashville Railway was apparently not so extravagant in the opinion of investors as the appellant contends. It is true that over a million dollars had been spent by the new company and the receivers, but the Nashville Railway could have expended that amount out of the $1,651,000 of bonds, if necessary. The mortgage expressly provided that the proceeds of those bonds should be used for such expenditures, as shown above, and when a purchaser sees that bonds are so reserved he knows, or is presumed to know, that some or all of them may in time be issued.

7. We have thus gone at length into many of the points made by the appellant and have already considered those that seemed to us to be of most importance to refer to, excepting as to the relation the appellee bore to the appellant and to

this transaction which we will now do.  It must be remembered that the appellant was a purchaser of *bonds* and *not* of *shares of stock*.  It was immaterial to him whether the stockholders received any dividends or not, provided his principal and interest were paid.  A purchaser of stock may be influenced by many considerations that would not affect a purchaser of bonds.  The appellant in no sense occupied such a relation to the appellee, or to the railway company, as is referred to in *Hambleton* v. *Rhind*, 84 Md. on p. 487, where it is explained what a syndicate is and held that it is, *as respects the persons composing it*, a partnership.  He did not become a member of the syndicate, or even a stockholder, but simply a *creditor* of the railway company and a *purchaser* from the appellee.  Some cases have pointed out the distinction; for example, in *Banque* v. *Brown*, 34 Fed. Rep. 196, the Court said "While the promoters of a company occupy fiduciary relations towards those they induce to become shareholders; and the company itself is a trustee for its stockholders, bondholders stand upon a different footing.  They are merely lenders upon security, and as creditors part with their title to the money loaned."  To say that because a trustee is a stockholder in a railway company, owns some of its bonds, is receiving compensation for the sale of them, and had been a promoter of the company, he is to be held guilty of fraud in making representations that it believed, and had the right to believe, were true, if there afterwards proved to be some question about them, would in effect make the trustee a guarantor of the sufficiency of the security, on which the bonds were issued.  Such a doctrine would preclude a prudent trust company from selling the bonds of a corporation, in which it also had stock.  Mr. Donnelly could not have supposed that the appellee was selling the bonds without compensation and he might well have assumed that it had some of the stock, as it is at least not unusual in such transactions.  We have already indicated that the contentions of the appellant were not altogether consistent, as it contends in one branch of the case that he was not informed that the appellee had any interest other than as

trustee, and in another that the circular stated it was the owner of all the bonds. The fact is that the circular did inform purchasers that the appellee owned some of the bonds—how many, the appellant apparently did not seem to care, for he made no inquiries.

In *Cahill* v. *Applegarth* we referred to the Maryland cases and a number of those decided elsewhere, amongst the latter that of *Nash* v. *Minnesota Title Co.*, 163 Mass. 574. In that case the law, as announced in *Derry* v. *Peek*, 14 App. Cas. 337, was adopted, and the Court went on to give the reason for such doctrine. After saying that a party who had no interest in the subject-matter had no higher duty than to answer honestly and in good faith, added: "If one makes a statement for a consideration as a part of a contract, it is his duty to be accurate, and ignorance of mistake will not relieve him from the consequences of an error. In seeking a remedy from him for a mistake so made, the plaintiff in his declaration states his relation to the transaction and *sues in contract.*" It then goes on to say that while one who is not interested must not intentionally mislead, if he answers honestly, to the best of his ability, he does his whole duty, and that "It would be unjust to visit upon him the consequences of his ignorance in a matter in which he had no interest. *If he happens to have an interest in the subject to which his representations relate, it is a matter of which the law takes no cognizance in an action of deceit.*" There the title company was trustee in the mortgage given to secure the bonds, and was paid for that service. It also insured the titles to the property mortgaged, which was a part of its regular business, and was paid for that, as shown by the opinion in the case between those parties in 159 Mass. 437.

In *Kountze* v. *Kennedy*, 147 N. Y. 124, it was said "Intentional fraud, *as distinguished from a mere breach of duty* or the omission to use due care, is an essential factor in an action of deceit. But if through inattention, want of judgment, reliance upon information which a wiser man might not credit, *misconception of the facts or of his moral obligation to inquire,* he make

a representation designed to influence the conduct of another, and upon which the other acts to his prejudice, yet, if the misrepresentation was honestly made, believing it to be true, *whatever other liability he may incur he cannot be made liable in an action for deceit.*"     After stating that the law affords remedies for the consequences of innocent misrepresentation, CHIEF JUSTICE ANDREWS added: "While the common law action of deceit furnishes a remedy for fraud which ought to be preserved, we think it should be kept within its ancient limits, and should not by construction be extended to embrace dealings which, however unfortunate they may have proved to one of the parties, were not induced by actual intentional fraud on the part of the other."     The reference to this case above in another connection shows the circumstances under which these principles were, announced, which certainly required of the vendor as full a disclosure of the facts as this case did.     See also case of *Boddy* v. *Henry*, 113 Iowa, 462 (s. c., 53 L. R. A. 769), for a somewhat similar case.

*Derry* v. *Peek, supra*, is now perhaps the leading case on the 'subject, and it has been cited with approval by many Courts in this country, including our own.  The Act incorporating the company provided that the carriages might be moved by animal power, and, *with the consent of the Board of Trade*, by steam power.  The directors issued a *prospectus*, which stated that under the Act the company had the right to use steam power, and the plaintiff *took shares on the faith of that statement.*  The Board of Trade afterwards *refused its consent* and the plaintiff brought an *action of deceit* against the directors.  The great length this opinion has already reached, by reason of the numerous questions raised or suggested, prevents many citations from the different opinions delivered in that case, but they concur in holding that "making a false statement through want of care falls far short of, and is a very different thing from fraud, and the same may be said of a false representation honestly believed, though on insufficient grounds" and "that fraud is essential to found an action of deceit, and that it cannot be maintained when the acts proved

cannot properly be so termed." LORD BRAMWELL used this expression about "legal fraud:" " 'Legal fraud' is only used when some vague ground of action is to be resorted to, or generally speaking, when the person using it will not take the trouble to find, or cannot find, what duty has been violated or right infringed, but thinks a claim is somehow made out."[1] See also case of *Angus* v. *Clifford*, 2 Ch. 449, where the scope of *Derry* v. *Peek* is fully explained.

These cases are in accord with our own decisions—particularly those of *Cahill* v. *Applegarth* and *Boulden* v. *Stilwell*, the latest expressions on the subject, and in some respects the most analogous to the one now before us. Most of them in terms recognize such apparent exceptions as are referred to on p. 502 of 98 Md., where we said what acts would be equivalent to fraud. In *Cahill* v. *Applegarth* we were also careful to distinguish between actions of deceit and those in contract, or brought to rescind contracts. We are of opinion that the uncontradicted evidence (and by that we mean the proof as to the investigations made, reports received, reasons inducing the appellee to make the statements, etc.), justified the Court, under the law applicable to this form of action, in refusing to submit the case to the jury. When a defendant commits an act the law declares to be fraudulent, he must take the consequences when brought into Court on such a charge. But if the law is to give its approval to and encourage good character, it should not be too ready to obliterate the distinction between a good and a bad character, by leaving it to a jury to determine whether a defendant had reasonable ground for his belief (regardless of what the defendant thought and believed) and, if they find in the negative, to convict him of *deceit* when the *facts that are not disputed* show to the Court that he had reasonable ground for his belief in the truth of what he said. Especially is this so in a case like this, where the facts upon which the defendant relied were obtained after a thorough, and, so far as the record shows, honest investigation. This defendant is a corporation, but if guilty it is because its president and executive committee are guilty,

for it was as much the duty of the members of that committee, who were consulted and made acquainted with the facts, to see that the circular represented the truth, as it was of the president to write in it the truth, and hence we say what we do above as to character.

In view of the conclusion we have reached as to the ruling on the prayer, it will be unnecessary to discuss the other exceptions. It is sufficient to say that after a careful examination of all of them, we find no error that would require a reversal of the judgment. Those that present the rulings which are the most doubtful are immaterial now by reason of the conclusion reached on the prayer, as they could not affect the result. Those to the admission of evidence objected to by the appellant (such as 7th, 9th, 11th and 13th), are sufficiently answered by our reference to and reliance upon the evidence objected to.

After a careful and thorough investigation of the record, and the law applicable to the facts we are convinced that the rulings of the lower Court were correct, and the judgment will be affirmed.

> *Judgment affirmed, the appellant to pay*
> *the costs.*

(Decided June 23rd, 1905.)