BABB *v.* BOLYARD

[No. 86, October Term, 1949.]

604

*Decided March 9, 1950.*

Before MARBURY, C. J., DELAPLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

Submitted on brief by *H. G. Shores* and *Thomas Lohr Richards* for the appellant.

Submitted on brief by *Edward J. Ryan* and *William L. Wilson, Jr.* for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by defendant from a judgment for $900, entered on the verdict of a jury after a motion for judgment *n.o.v.* or a new trial had been overruled, in an action for deceit by the buyer against the seller of a used 1946 Buick automobile.

The purchase was negotiated and contracted for in Cumberland on January 27, 1947 and consummated the same day. The price was $3,000, viz: $1,100 allowed for a used 1941 Ford turned in by plaintiff, $700 cash paid by check, and $1,200 furnished by a finance company, presumably on a conditional sale contract or a chattel mortgage. The purchase was negotiated between plaintiff and defendant's salesman, Ben Oscar Frantz. Plaintiff went to defendant's "used car lot" and was looking at the Buick. He says Frantz came out and asked him if he was interested in the car, he said he would like to have one, and asked Frantz the price of the car, Frantz said the car sold at $3,000, the same as a new car, that is dealer's prices (*sic.*), Buick dealers; he said, "Well, that is outrageous for that car", "Do they sell for that?", Frantz said, "Yes, that is the price of that car at dealer's price", Frantz said, "Well, let's try

the car out", which they did; Frantz asked whether he had a car, they went across the street and looked at the Ford, and Frantz offered him $1,100 in trade for it; then Frantz said, "Well, this car sells for $3,000; that is what the Buick dealer sells it for, and it is a great car;" "I went and signed the papers up there, at the price of $3,000 for the car"; the next day a dealer at Keyser told him that the price of a new Buick was $1,986; you could not get any new car [including Buick or Ford] at that time; [the Cumberland Buick dealer had a waiting list a year long]; the price of a new Ford was then about $900; if he had known that the price of a new Buick of the same model was $1,986, he would not have bought this car and paid $3,000; "I wanted to go to the Buick dealer, and he said it wasn't necessary and he wouldn't let me, and he kept after me until I signed the papers"; he was going to call the Buick dealer and Frantz told him not to; he made no effort to find out from any authorized agency before the purchase what the price of new cars was; he "was taking his word as to the price of the car"; the day after the purchase he brought the car back and told Frantz what he had found out about the price; "he said he didn't want to have any trouble, and I told him what I was going to do; I was going to see Lawyer Ryan." Mr. Ryan wrote defendant on January 30, 1947 that plaintiff "had been deceived" and "has a right of action against you"; he did not offer or request rescission. About six months after the purchase plaintiff sold the Buick to a used car dealer for $2,100 because he could not make the payments on it to the finance company. When he sold it he did not know what the price of a new Buick then was.

The negotiation and consummation of the contract at Cumberland took about two hours. Part of this time plaintiff's father or brother-in-law, or both, were present. The brother-in-law says Frantz told plaintiff the price of the car was $3,000, plaintiff said, "Is that the dealer's price of the car?", Frantz said, "Yes, that is dealer's price", plaintiff said, "I would like to find out", and Frantz said, "There is no use to call for I wouldn't

lie to you about it"; he said to plaintiff, "That is a pretty big price to pay for that 1946 Buick", and suggested that they "go some place else and look at another car lot"; he went to get the Ford, and by the time he got back plaintiff had already signed the contract to take the Buick. "We was going some place else to look at another car". That is what he wanted plaintiff to do. Plaintiff's father says plaintiff "wanted to call up the Buick people and find out the price" and Frantz said, "That is the price", "the original price of the cars".

Plaintiff never made any complaint about the Buick except about the price. Defendant is in the used car business; he does not sell any new cars at all. He says he bought the Buick for $2,750 a few weeks before the sale to plaintiff, and paid a five per cent commission for the sale, leaving him a profit of $100 on the car; Frantz "made the sale when they were out of doors at the car"; "after the sale was made, they brought it in to me to complete the sale"; the "finance papers" were signed in his office; plaintiff "didn't have his title with him, so he signed the finance papers for $1,200 and I rode up to Keyser with him and he gave me his check for $700 and signed his title up there and gave them to me." He told plaintiff new Buicks were not available at any price; plaintiff did not say anything objecting to the price of $3,000; he did not quote to plaintiff what the price of new Buicks was; he did not have that information. The written contract of sale contains a provision that "no warranty, express or implied, representation, promises, or statements, oral or written, in reference to said property have been made by the seller unless endorsed hereon in writing". Frantz says he told plaintiff, "Our price is $3,000", and not that the price of a new Buick was $3,000, because he didn't know. He also denies that he told plaintiff that he need not call the Buick people about the price, that it was not necessary.

The common law of torts, like the Statute of Frauds, reflects the public policy that the cause of justice should not be thwarted by a pursuit of abstract justice which does more harm than good. The same public policy is

embodied and expressed in Chapter 1010 of the Acts of 1945, which abolishes rights of action for breach of promise to marry and for alienation of affections. Code, 1947 Supp., Art. 75C, secs. 1-8. By mention of this act we do not intimate that any provision of the act is or is not constitutional. Mr. Poe, in his work on Pleading, says of the action for deceit, "This is a species of action not very common; but still, as it occurs sometimes, it is proper to notice it." *Poe* on *Pleading,* § 198. Before 1789 actions in the nature of deceit were maintained for breach of express or implied warranty. *Poe, id.,* § 200. *Pasley v. Freeman,* 3 Term Rep. 51 (1789), was without precedent in sustaining an action for deceit when there was no privity of contract between the parties. One judge dissented. Lord Eldon, when he was Chief Justice, always doubted the principles of the case and, as Lord Chancellor, declared it "in practice and experience most dangerous" and suggested that it might become necessary for the Statute of Frauds to be applied to such cases against strangers to a contract. *Evans v. Bicknell,* 6 Ves. 174, 186. *Pasley v. Freeman,* however, became the leading case on actions for deceit, whether between parties to a contract or against a stranger, and was followed in *McAleer v. Horsey,* 35 Md. 439, 453, the leading case in Maryland, but the doctrine of *Pasley v. Freeman* has never been expanded in Maryland. In *Boulden v. Stilwell,* 100 Md. 543, 557-558, 60 A. 609, 612, 1 L. R. A., N. S., 258, the court by Judge Pearce, referring to the opinion in *McAleer v. Horsey* by Judge Miller, said, "This case is a practical illustration of the instances referred to by Judge Miller, in which a man 'may succeed in establishing a perfect legal title to advantages to which he has no moral right' if the testimony at this stage of the case, is assumed to be true, as it must be." In some states the action for deceit has been expanded, with results not always satisfactory, to cover, besides actual fraud, negligent misrepresentation. *Contra, Boulden v. Stilwell, supra; Donnelly v. Baltimore Trust & Guarantee Co.,* 102 Md. 1, 61 A. 301; *Derry v. Peek,* 14 App. Cas. 337; *cf. Restatement, Torts,* § 526, § 311 and

caveat. In this respect the remedy in equity for rescission is broader than the action for deceit. *Cf. Donnelly v. Baltimore Trust & Guarantee Company, supra,* with *Findlay v. Baltimore Trust & Guarantee Company,* 97 Md. 716, 55 A. 379. By the Securities Act and the Securities Exchange Act liabilities have been imposed upon issuers and underwriters of securities, and officers and directors dealing in listed securities, which go far beyond the scope of an action for deceit. *Cf. Donnelly v. Baltimore Trust & Guarantee Co., supra; Cahill v. Applegarth,* 98 Md. 493, 56 A. 794; *Boulden v. Stilwell, supra; Reynolds v. Evans,* 123 Md. 365, 91 A. 564. In Maryland for the protection of buyers, the Retail Instalment Sales Act imposes upon sellers various duties, and penalties for violation, and gives buyers remedies by cancellation, not by action for deceit. Acts of 1941, ch. 851, Code, 1947 Supp. Art. 83, secs. 116-140; *Stride v. Martin,* 184 Md. 446, 41 A. 2d 489. No violation of this statute is charged in the instant case.

Since *McAleer v. Horsey, supra,* repeated decisions of this court have established rules and precedents which must govern the decision in the instant case. "The foundation of the action is actual fraud and nothing short of this will suffice. * * * The fraud must be material, by which is meant, without it that the transaction would not have been made. It must be a statement of an alleged existing fact or facts, and not merely of some future or contingent event, or an expression of opinion as to the subject of the statement. The party to whom it is made must rely upon its truth, and must have the right, as a person of ordinary business prudence, to rely upon it, 'otherwise it is his own folly or fault, for the consequences of which he cannot ask relief of the law;' and finally there must be damage directly resulting from the fraud." *Boulden v. Stilwell, supra,* 100 Md. at page 552, 60 A. at page 610. "It is well settled by all the authorities that the fraud must work an actual injury to the party complaining and it must appear that he not only did in fact rely upon the fraudulent statement, but had a right to rely upon it in the full belief

of its truth, for otherwise it was his own folly or fault, and he cannot ask the law to relieve him from the consequences." *Reynolds v. Evans,* 123 Md. 365, 367, 91 A. 564, 565. It is generally held that a representation as to value is only an expression of opinion, not a statement of fact. It has been held that, at least in particular cases, representations as to the real ownership of stock sold are not material. *Cahill v. Applegarth, supra; Boulden v. Stilwell, supra; Reynolds v. Evans, supra. Cf. Donnelly v. Baltimore Trust Co., supra.* A false representation that a defendant has sold his stock to A is not one upon which a plaintiff is entitled to rely as a basis for an action for deceit in inducing the sale of the plaintiff's stock to A. *Boulden v. Stilwell, supra,* 100 Md. at page 556, 60 A. at page 612.

Assuming, as we must, the truth of plaintiff's evidence, with the most favorable permissible inferences, we find no evidence legally sufficient to entitle him to recover. Nor do we consider this case an instance in which a man "may succeed in establishing a perfect legal title to advantages to which he has no moral right." There is no evidence that the Buick was not worth $3,000, the price agreed upon and paid, or that any damage to plaintiff resulted from the purchase. Defendant got no unconscionable advantage, only a $100 profit, from the purchase and sale by him. Plaintiff says he would not have bought if he had known that new Buicks were selling for $1,986—obtainable after a year. His actions do not support his words. There is no evidence that he made any real effort to return the car. We do not intimate that he had a right to do so. When he later sold the car he did not know, or apparently care, what the price of new Buicks then was.

In any event, he had not "the right, as a person of ordinary business prudence", to rely upon the alleged misrepresentation of the dealer's price of new Buicks. If new cars had been obtainable, used cars would not have brought a premium, and the market price of new cars might have been a material fact in the purchase of a used car. Whether even then a purchaser would

have had a right to rely on a representation as to the dealer's price of new cars, instead of finding out by going or telephoning to a dealer, we need not decide. In the circumstances we think the price of new Buick "futures" was not material to an immediate purchase of a used Buick. In a free market a misrepresentation of the market price of a new Rolls-Royce or a horse and buggy would hardly be material in a purchase of a used Buick. If a person bought Pennsylvania Railroad shares on a misrepresentation of the latest price on the New York Stock Exchange, the fact represented would be material, but we are not prepared to say the purchaser would have the right to rely on the representation instead of picking up a daily newspaper and ascertaining the truth. A house wife who bought a bag of flour from a grocer could not maintain an action for deceit in a misrepresentation of the Chicago price of grain "futures".

Defendant's request for a directed verdict and his motion for judgment *n. o. v.* should have been granted.

*Judgment reversed, with costs.*