688 A.2d 976

**Lonnie MILLER**

v.

**Warren RATNER et al.**

**No. 821, Sept. Term, 1996.**

Court of Special Appeals of Maryland.

Feb. 7, 1997.

**20**

Hubert M. Schlosberg (John B. Mesirow, on the brief), Washington, DC, for appellant.

Albert D. Brault (Regina A. Casey, Joan F. Brault, and Brault, Graham, Scott & Brault, on the brief), Rockville, for appellee, Warren Ratner.

Mary Elizabeth McCormick (Gleason, Flynn, McCormick & Emig, on the brief), Rockville, for appellee, Dennis Ratner.

Argued before MURPHY, C.J., and MOYLAN, CATHELL, JJ.

CATHELL, Judge.

In 1945, the Legislature abolished the cause of action for breach of promise to marry. In the fifty-one years since, there has been no Maryland reported case in which the abolishment of that cause of action has been at issue. This, then, shall be the first.

In the Circuit Court for Montgomery County, Judge Martha G. Kavanaugh granted Warren Ratner's and Dennis Ratner's,[1] appellees', motions for summary judgment against Lonnie Miller, appellant. In the posture of this case, we must presume the accuracy of all factual allegations made by appellant, the party against whom the motion was granted. Accordingly, we shall recount some of the factual matters presented to the trial judge as if true, with the realization that their truthfulness has not been litigated. Our discussion may, therefore, include some of appellant's allegations of atrocious conduct on the part of appellees. While, as we have said, for the purpose of this appeal, we shall presume them to be true, we will be relying on just that presumption, not proven facts.

Ms. Miller and appellee, Warren Ratner, began to live together, apparently at his request. Appellant, at his request, substantially altered her lifestyle. After living with appellee for approximately three years, appellant became seriously ill with breast cancer. He initially supported her, but later rejected her and ordered her to leave his house. She refused.

---

1. We shall occasionally refer to one or the other of appellees by their first names. We do so only in order to distinguish between the two appellees and not for the purpose of being informal in any respect.

She alleges that Warren, and his brother Dennis, then conspired to inflict emotional distress upon her in order to cause her to vacate Warren Ratner's house (and his life).

She alleges that, while she was ill from undergoing radiation treatments, Warren repeatedly woke her up in the middle of the night admonishing her to leave. She alleges that Warren's brother Dennis, also an appellee, telephoned her during the same period, calling her "bitch," "whore," and a "one-breasted woman." He told her that his brother "deserves a whole woman, not a one breasted woman." He told Ms. Miller on at least one occasion, "fuck you." She further alleges that Warren repeatedly told her she was a financial burden and that she was going to die. She proffered that Warren threatened her with bodily harm if she did not leave his house and told her that if she did not voluntarily vacate his house, he would have her put out by the "Woodridge boys."

Eventually, she moved out. Thereafter, she obtained a job with Universal Debit Credit. She alleges, even then, that appellees "continued to torment her" by causing her not to get the business of The Hair Cuttery, an entity owned by appellees or by a corporation evidently controlled by them. She also alleges that Warren filed a false claim in the bankruptcy proceedings she ultimately was forced to file.

Appellant presents twelve questions:

1. Was the contract Plaintiff and Defendant Warren Ratner entered into a contract to marry?

2. Was illicit sexual intercourse consideration for the contract the Plaintiff and Defendant Warren Ratner entered into?

3. Was Defendant Warren Ratner acting adversely to Creative Hairdressers, Inc. or within the scope of his authority when he interfered with the Plaintiff's prospective advantage?

4. Was Defendant Warren Ratner's conduct toward the Plaintiff intentional or reckless?

5. Was Defendant Warren Ratner's conduct toward the Plaintiff extreme and outrageous?

6. Was there a causal connection between Defendant Warren Ratner's wrongful conduct and the Plaintiff's emotional distress?

7. Did the Plaintiff suffer severe emotional distress due to Defendant Warren Ratner's conduct?

8. Did Defendant Warren Ratner conspire with Defendant Dennis Ratner to commit an unlawful act?

9. Was Defendant Dennis Ratner's conduct toward the Plaintiff intentional or reckless?

10. Was Defendant Dennis Ratner's conduct toward the Plaintiff extreme and outrageous?

11. Was there a causal connection between Defendant Dennis Ratner's wrongful conduct and the Plaintiff's emotional distress?

12. Did the Plaintiff suffer severe emotional distress due to Defendant Dennis Ratner's conduct?

We shall respond only to those questions necessary to our resolution of the main issues.

We begin by examining appellant's Complaint and amended complaints. The original complaint provided in paragraph four that Warren Ratner asked her to move in with him. In paragraphs five and six, appellant asserted that:

5. ... There was a mutual understanding that the defendant and the plaintiff were making a permanent commitment that *would* be followed by marriage.

6. The plaintiff relied upon the defendant's *promises* and moved into what the defendant referred to as "our home...." *In anticipation of their marriage,* the defendant told [her] that he had "plenty of money" and that he would take care of her. [Emphasis added.]

In Count I of the original complaint, Breach of Contract, the a foregoing provisions were incorporated "as if they were fully repeated and set forth again" therein. They were also, likewise, incorporated in Count II, Tortious Interference with Prospective Advantage, and Count III, Intentional Infliction of Emotional Distress. Thereafter, appellant filed a Scheduling

Conference Statement, in which she alleged, in part, that she and appellee Warren Ratner "were engaged to be married."

Subsequently, an Amended Complaint was filed. In that amended complaint appellant reiterated:

5. ... There was a mutual understanding that the defendant and the plaintiff were making a permanent commitment that *would* be followed by marriage.

6. The plaintiff relied upon the defendant's *promises* and moved.... In anticipation of their marriage, the defendant told the plaintiff ... that he would take care of her. [Emphasis added.]

Again, appellant incorporated those statements into each of her counts, stating, as she did in the original complaint, that the allegations were incorporated "as if they were fully repeated and set forth again herein."

Thereafter, appellant filed a Second Amended Complaint. That complaint added an Intentional Infliction of Emotional Distress count, in which appellant incorporated, "as if fully set forth herein, *the entire Amended Complaint,*" thereby adding the above statements about marriage promises to that new count. (Emphasis added.) Subsequently, appellant filed a Third Amended Complaint that added a civil conspiracy count. In it, she again incorporated "as if fully set forth herein, the *entire* amended complaint and Second Amended Complaint," thereby incorporating into the civil conspiracy count the marriage promises we have above quoted. (Emphasis added.)

Warren Ratner filed a Motion for Summary Judgment as to Counts I, II, III, and IV of the Third Amended Complaint. Count I was the Breach of Contract count against Warren, Count II was the Tortious Interference with Prospective Advantage count against Warren, and Count III was the Intentional Infliction of Emotional Distress count against Warren. Count IV alleged a civil conspiracy by both Warren and Dennis Ratner to "inflict" severe emotional distress on Ms. Miller.

In Warren Ratner's motion, his counsel argued that appellant's "claims" were, in substance, claims for breach of prom-

ise to marry and that these were barred under the law of Maryland; that her breach of contract claim was not actionable "because it [was] based on consideration for illicit sexual intercourse;" and that appellant was precluded from maintaining a claim for intentional infliction of emotional distress because she had not suffered a severely disabling injury from appellees' conduct. Warren Ratner also disclaimed liability for tortious interference with prospective advantage as a matter of law.

Dennis Ratner also filed a Motion for Summary Judgment on his behalf as to the counts against him. He incorporated Warren's position and arguments and further expounded upon them as deemed necessary.

Ultimately, the trial judge granted both motions for summary judgments. She opined:

Although I have sympathy for Ms. Miller [appellant], I fail to see how the Court would uphold this contract as enforceable when we do have a statutory scheme that is outlined in detail for married partners upon the dissolution of marriage, *why this plaintiff would be able to come into court as an unmarried person and enforce this contract when it was never considered by the legislature to be valid.*

As far as the intentional infliction of mental distress, I have reviewed the cases. I have looked at all the labor dispute ones, and I would agree with Mr. Brault [counsel for Warren Ratner] that every relationship that breaks up has emotional distress, but I do not believe that our Court of Appeals at this time is willing to, under these facts, uphold a cause of action for intentional infliction of mental distress.

I think allowing this lawsuit to go forward would open the floodgates, and I am not willing at this point to make this public policy.

So, for that reason, I am going to grant summary judgment motions on all counts. [Emphasis added.]

While the trial court's comment can be construed to be a comment on the "palimony" issue, its comments, especially the comment as to an unmarried person enforcing a contract

"never considered by the legislature to be valid" can be equally construed to be applicable to the law enacted by the Legislature in 1945 that then declared such contracts "absolutely void."

We shall affirm the trial court's grant of summary judgment in favor of appellees.

## The Law

In reviewing the grant of a summary judgment motion, we are concerned with whether a dispute of material fact exists. *Arnold Developer, Inc. v. Collins,* 318 Md. 259, 262, 567 A.2d 949 (1990); *Bachmann v. Glazer & Glazer, Inc.,* 316 Md. 405, 408, 559 A.2d 365 (1989); *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985); *Markey v. Wolf,* 92 Md.App. 137, 170–71, 607 A.2d 82 (1992). "A material fact is a fact the resolution of which will somehow affect the outcome of the case." *King,* 303 Md. at 111, 492 A.2d 608 (citing *Lynx, Inc. v. Ordnance Prods., Inc.,* 273 Md. 1, 8, 327 A.2d 502 (1974)). "A dispute as to a fact 'relating to grounds upon which the decision is not rested is not a dispute with respect to a *material* fact and such dispute does not prevent the entry of summary judgment.' " *Seaboard Sur. Co. v. Richard F. Kline, Inc.,* 91 Md.App. 236, 242–43, 603 A.2d 1357 (1992) (quoting *Salisbury Beauty Schools v. State Bd. of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367 (1973)). We have further opined that in order for there to be disputed facts sufficient to render summary judgment inappropriate, "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 244, 603 A.2d 1357.

The Court of Appeals has stated that "the proper standard for reviewing the granting of a summary judgment motion should be whether the trial court was legally correct." *Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 592, 578 A.2d 1202 (1990) (citations omitted). The trial court, in accordance with Maryland Rule 2–501(e), shall render summary judgment forthwith if the motion and response show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of

law. The purpose of the summary judgment procedure is not to try the case or to decide the factual disputes, but to decide whether there is an issue of fact that is sufficiently material to be tried. *See Coffey v. Derby Steel Co.,* 291 Md. 241, 247, 434 A.2d 564 (1981); *Berkey v. Delia,* 287 Md. 302, 304, 413 A.2d 170 (1980). Thus, once the moving party has provided the court with sufficient grounds for summary judgment,

> [i]t is ... incumbent upon the other party to demonstrate that there is indeed a genuine dispute as to a material fact. He does this *by producing factual assertions, under oath,* based on the *personal knowledge* of the one swearing out an affidavit, giving a deposition, or answering interrogatories. "Bald, unsupported statements or conclusions of law are insufficient."

*Lowman v. Consolidated Rail Corp.,* 68 Md.App. 64, 70, 509 A.2d 1239, *cert. denied,* 307 Md. 406, 514 A.2d 24 (1986) (citation omitted; some emphasis added). With these considerations in mind, we turn to the case *sub judice.*

We note again that if appellant's representations are accurate and true, the actions and words of appellees were at the least reprehensible. Appellant's representations, however, may not be accurate. Because of the posture of the case, our function is to determine whether the trial court erred in granting summary judgment even if it, and we, assume appellant's representations as to appellees' conduct are true. In other words, if such vile conduct did occur, is it actionable. Can appellees be sued for it?

 We shall break down our consideration of the case to (1) appellees' assertions that this is really a case for breach of promise to marry, especially as to those counts that traditionally would constitute that type of cause of action or inferentially could, and (2) if necessary, to appellees' assertion that whatever counts are not directly resolvable by the application of the Maryland bar against suits for a breach of promise to marry are otherwise unmaintainable under the circumstances here present. We look first to the statute that prohibits

actions for a breach of promise to marry and the Legislature's purpose in enacting it.

The common-law causes of action for breach of promise to marry and for alienation of affections were first abolished in this State in 1945 by the enactment of Chapter 1010, House Bill 341. The prohibitions as to both causes of action have been codified together throughout all of the subsequent statutory history. The original act included an express statement of public policy that was included in the first several reenactments, but not specifically included, although acknowledged, in later codifications. We include that original declaration of policy here in order to emphasize the importance that the General Assembly attached to the abolition of these causes of action.

## PROHIBITED ACTIONS

1. (Declaration of Public Policy of State.) The remedies heretofore provided by law for the enforcement of actions based upon alleged alienation of affections and alleged breach of promise to marry, having been subjected to grave abuses, causing extreme annoyance, embarrassment, humiliation and pecuniary damage to many persons wholly innocent and free of any wrongdoing, who were merely the victims of circumstances and such remedies having been exercised by unscrupulous persons for their unjust enrichment, and such remedies having furnished vehicles for the commission or attempted commission of crime and in many cases having resulted in the perpetration of frauds, it is hereby declared as the public policy of the State that the best interests of the people of the State will be served by the abolition of such remedies.[2]

---

2. During the same general period, several states also abolished both causes of action. They include Florida, New York, Pennsylvania, Alabama, California (perhaps), Indiana, Massachusetts, Michigan, New Hampshire, New Jersey, North Carolina, Colorado (perhaps), Maine, Nevada, Wyoming. (Some of the states have special provisions, sometimes case created, permitting suits to recover engagement rings and other property transferred to the other party.) Consistent with the

1945 Md. Laws, Chap. 1010; Md.Code (1951), Art. 75C, § 1; Md.Code (1957), Art. 75C, § 1.

statement of policy by the Maryland Legislature are comments by other state courts as to those states' public policy. The Supreme Court of Florida stated:

> [T]he legislature ... [may] regulate ... any right growing out of [the marriage] relation.... Perhaps the strongest argument in support of the act [the Florida statute prohibiting breach of promise suits] is that perverted sexual relations are often found lurking in these cases, and when it comes to measuring perverted chastity in terms of "heart balm", society has not yet set up a standard as it has with peanuts and popcorn and other tangibles....
>
> ... [W]hen they [breach of promise actions] became an instrument of extortion and blackmail, the legislature ... may ... abolish them.

*Rotwein v. Gersten*, 160 Fla. 736, 36 So.2d 419, 421 (1948). The Court of Appeals of New York opined:

> "... [W]e view the marriage engagement as a period of probation, so to speak ... and if that probation results in ... incompatibility of tastes and temperament ... and incurable repugnance of one to the other ... duty requires that the match be broken off...."
>
> ....
>
> Thoughtful people ... have long realized that the scandals growing out of actions to recover damages for breach of promise to marry constituted a reflection upon the courts and a menace to the marriage institution, and thereby a danger to the state....
>
> Because experience has demonstrated that the maintenance of [such] actions ... have resulted in injury to the marriage institution and thereby interfered with the general welfare, the Legislature, in order to correct the evil ... had authority to abolish the cause of action....
>
> ....
>
> The Legislature ... has determined ... that marriages should not be entered into because of the threat or danger of an action to recover money damages and the embarrassment and humiliation growing out of such an action.

*Fearon v. Treanor*, 272 N.Y. 268, 5 N.E.2d 815, 816–17 (1936).

> In a number of states, the right of action for breach of promise to marry has been abolished by statute (commonly referred to as "heart balm" statutes).... It has been said that a state legislature has plenary power ... to determine as a matter of public policy that marriages should not be entered into because of the danger or threat of an action for breach of promise. The purpose of such statutes is to avert the perpetuation of fraud by adventurers or adventuress who were prone to use the threat of a breach of promise of marriage action to compel over apprehensive and naive defendants to make lucrative settlements in order to avoid the embarrassing and lurid notoriety which accompanied litigation of this character.

12 Am.Jur.2d *Breach of Promise* § 18 (1964) (footnotes omitted).

We suspect that we would be hard pressed to find a stronger expression of a legislative entity's attitude of repugnance towards a cause of action in statutory language. Moreover, the legislature attempted to make sure that the causes of actions therein abolished could not thereafter be incidentally recreated or resurrected by subsequent act. It provided what we perceive to be an attempt to foreclose waiver and estoppel issues by limiting, perhaps us, and perhaps even itself, from undoing the effects of the legislation when it included a provision we do not recall seeing with any great frequency in other legislative acts. Chapter 1010 provided:

> 4. (Legal Effect of Certain Acts Hereafter Occurring.) No act hereafter done within this State shall operate to give rise, either within or without this State, to any of the rights of action abolished by this Article.

The Act declared, in very broad language (perhaps even broad enough had it survived to this date to foreclose efforts to create "palimony" actions [3]), that certain contracts were void as against public policy:

> All contracts and instruments of every kind, name, nature or description, which may hereafter be executed within this State in payment, satisfaction, settlement or compromise of any claim or cause of action abolished or barred by this Article, whether such claim or cause of action arose within or without this State, are hereby declared to be contrary to the public policy of this State and absolutely void. It shall be unlawful to cause, induce or procure any person to execute such a contract or instrument; or cause, induce or procure any person to give, pay, transfer or deliver any money or thing of value in payment, satisfaction, settlement or compromise of any such claim or cause of action;[ [4]] or to

---

**3.** The term "palimony" somehow arose out of *Marvin v. Marvin*, 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976), although the term was never used in that case.

**4.** This clause *has survived* and is now codified in section 3–104(a) of the Family Law Article, stating that "[a] contract for payment or settlement

receive, take or accept any such money or thing of value as such payment, satisfaction, settlement or compromise. It shall be unlawful to commence or cause to be commenced, either as party or attorney, or as agent or otherwise in behalf of either, in any court of this State, any proceeding or action seeking to enforce or recover upon any such contract or instrument, knowing it to be such, whether the same shall have been executed within or without this State; provided, however, that this action shall not apply to the payment, satisfaction, settlement or compromise of any causes of action which are not abolished or barred by this Article, or any contracts or instruments heretofore executed or to the bona fide holder in due course of any negotiable instrument which may be hereafter executed.

It then went even further by providing criminal penalties for violations of the Act:

7. (Penalties.) Any person who shall violate any of the provisions of this Article shall be guilty of a misdemeanor which shall be punishable by a fine of not less than One Thousand Dollars ($1,000) nor more than Five Thousand Dollars ($5,000), or by imprisonment for a term of not less than one (1) year not more than five (5) years, or by both such fine and imprisonment, in the discretion of the Court.

1945 Md. Laws, Chap. 1010. The statute also stated that it was intended to be remedial and to "be liberally construed to effectuate the objects and purposes thereof and the public policy of the State as hereby declared." 1945 Md. Laws, Chap. 1010.

The statute was later codified unchanged as Article 75C of the 1951 Annotated Code of Maryland. Subsequently, it was included relatively intact in the 1957 Annotated Code of Maryland, again as Article 75C. In the subsequent recodification of several statutes into the Courts and Judicial Proceedings Article by Chapter 2 of the 1973 Special Session Laws of

---

of a claim abolished or prohibited by this title is void and unenforceable."

Maryland, Section 5–301, which barred actions for alienation of affections and breach of promise to marry, was created. There were, as related to the case *sub judice*, no substantive changes. The revisor's note to this recodification stated:

> The specific declarations of public policy are not included in this section as it is believed they are well understood and the need for repeating them is minimal; nevertheless these considerations are still relevant, and there is no intention to affect them by the repeal of §§ 1–9 [of the previous statute].

Md.Code (1974), § 5–301 of the Courts and Judicial Proceedings Article.

Interestingly, this codification of the previous statute into the Courts and Judicial Proceedings Article still retained the provisions making it a criminal offense, subject to fines of $500 and imprisonment for a minimum of one year and up to five years for anyone attempting to assert a breach of promise to marry or alienation of affection claim (except as to a pregnant plaintiff). See Md.Code (1974), § 5–301(c) of the Courts and Judicial Proceedings Article. Subsequently, by Chapter 214 of the 1986 Acts, the provisions providing for criminal penalties were repealed.[5]

The bar to actions for breach of promise to marry and alienation of affections was subsequently recodified in separate sections of the Family Law Article. See 1984 Md. Laws, Chap. 296. Section 3–102 of the Family Law Article states that "[u]nless the individual is pregnant, an individual: (1) has no cause of action for breach of promise to marry; and (2) may not bring a cause of action for breach of promise to

---

5. The bill file of the statute repealing this provision contains one of the shortest statements of a statute's purpose we have been privileged to review. Delegate Morningstar introduced the statute because the provision being repealed was "unenforceable—looks silly." We would note, however, that it was relatively effective in that its purpose, *i.e.*, to restrict suits in violation of the statute, was met in that for forty-one years, no such cases reached the appellate courts. Apparently, there was little need for enforcement.

marry regardless of where the cause of action arose." [6] The revisor's note to the recodification in the Family Law Article provided:

> This section is new language derived without substantive change from the second sentence of former CJ § 5–301(a).
>
> In subsection (a) of this section, the language "has no cause of action for alienation of affections" is substituted for the former language that stated that the "cause of action for alienation of affections is prohibited" to clarify legislative intent to bar the right as well as to prohibit the remedy.

1984 Md. Laws, Chap. 296.

We have included this rather extensive review of the predecessor statutes for two primary purposes: (1) to emphasize what we view as the extraordinarily strong statement of public policy that is evidenced by (i) the statement first found in the original enactment and repeated and/or reaffirmed since then, (ii) the initial effort by the General Assembly to forbid any future modifications (apparently by the judiciary) of its prohibitions, and (iii) the creation of a criminal offense with severe criminal sanctions for those attempting to ignore the proscription, including attorneys—criminal sanctions that remained intact until recently; and (2) to emphasize that the prohibitions against both breach of promise to marry and alienation of affections actions were originally enacted together under the same strong public policy statement and criminal penalty sanctions, and have remained together, if not as twins as close siblings, throughout all of the rest of the history of the statute.

Accordingly, in our resolution of these issues, we shall remain cognizant of the strong statement of public policy and, until relatively recent times, the criminal character of attempts to circumvent the law. We shall also consider closely those cases involving alienation of affections, as we perceive them to be so closely related as to have strong precedential value in respect to breach of promise to marry cases.

---

6. The bar to alienation of affection actions is codified in section 3–103 of the Family Law Article.

**34**

As we previously noted, in the fifty-one years since the statute prohibiting cases for breach of promise to marry was enacted, there has, apparently, been no reported Maryland case construing it.[7] As we shall indicate later, our finite review of foreign jurisdictions indicates that there has not been developed a substantial body of law elsewhere relating specifically to the application of statutory proscriptions to breach of promise to marry cases, although there are several cases we will address. Most of the limited foreign consideration, like Maryland's case-law treatment of this type of proscription, has been generally limited to cases involving the statutory prohibitions of alienation of affections actions and, to some extent, actions for criminal conversation. We shall rely for some guidance on the treatment of those causes of action given their close association with breach of promise to marry actions. We initially note that our late Chief Judge Gilbert briefly noted, as dicta, in the fraud case of *Collection & Investigation Bureau of Maryland, Inc. v. Linsley*, 37 Md. App. 66, 68, 375 A.2d 47 (1977), the historical origins of the bar to breach of promise actions. Speaking to the original enactment of the Statute of Frauds by the English Parliament during the reign of King Charles II, 1660–1688, Chief Judge Gilbert stated:

> Other provisions of § IV of the Statute [of Frauds] have been lifted from that act and are now codified in various articles of the Maryland Code annotated, or as in the case of suits for breach of promise barred as a cause of action, unless the plaintiff is pregnant. [Citing then section 5–301(a) of the Courts & Judicial Proceedings Article; footnote omitted.]

It appears that the bar has been a part of English jurisprudence since the 1600's. If so, Maryland's prohibition was somewhat belated.

The earliest mention in Maryland cases we have found of the statutory prohibition of breach of promise to marry and

---

7. Counsel for the parties informed us that they had found none. We, too, have found none.

alienation of affections suits occurred in the deceit case of *Babb v. Bolyard,* 194 Md. 603, 607–08, 72 A.2d 13 (1950), in which the Court of Appeals noted:

> The common law of torts, like the Statute of Frauds, reflects the public policy that the cause of justice should not be thwarted by a pursuit of abstract justice which does more harm than good. The same public policy is embodied and expressed in Chapter 1010 of the Acts of 1945, which abolishes rights of action for breach of promise to marry and for alienation of affections. By mention of this act we do not intimate that any provision of the act is or is not constitutional. [Citation omitted.]

Another of the few early mentions of the statutory proscription at issue here was in the defamation and criminal conversation case of *Di Blasio v. Kolodner,* 233 Md. 512, 197 A.2d 245 (1964). In an earlier suit, Kolodner's client, Rezek, (Kolodner was an attorney) brought suit against Di Blasio alleging that Di Blasio had "debauched and carnally knew" the client's wife and had impregnated her. There were several counts in the original suit, all encompassed by the criminal conversation allegations. Di Blasio, in the original suit, moved for judgment on the ground that the criminal conversation action was really an alienation of affections action and that such actions had been abolished. Rezek asserted that it was a criminal conversation action, which had not been abolished. Subsequently, while the criminal conversation suit was pending, Di Blasio sued Rezek and Kolodner for libel based on their allegations against him in the original action.

The Court, in the second action, found it necessary to discuss the statute abolishing actions for alienation of affections and breach of promise to marry. The Court first discussed parts of the Legislature's public policy statement that we have heretofore recounted. It then noted that alienation of affections and criminal conversation are separate, though closely related, torts. Following the lead of the Supreme Court of Pennsylvania, and citing that court's cases, the *Di Blasio* Court held that the tort of criminal conversation had not been abolished. The Court, in doing so, and in

comparing the public policy statements of the Pennsylvania and Maryland statutes, noted that "our public policy is declared only as to the causes of action mentioned [breach of promise and alienation of affection]." The Court (albeit probably as dicta in that it was describing a statute it was holding did not apply to its case) then opined:

> We find no reason for holding that the General Assembly did not mean exactly what it said—no more and no less— with regard to the kinds of causes of action which it undertook to abolish. It will be observed that even as to one of such causes of action which it did undertake to abolish generally—breach of promise to marry—it carefully made an exception "in cases wherein pregnancy exists." Our Art. 75 C says nothing whatever about causes of action for criminal conversation, and we think that they are not abolished by it. See *Antonelli v. Xenakis* [363 Pa. 375, 69 A.2d 102 (1949)]. Our reading of Art. 75 C as covering only the two causes of action specifically mentioned in it is in accord with Judge Markell's description of its scope in *Babb v. Bolyard, supra.*
>
> We cannot read into § 9 of Art. 75 C, which provides for liberal construction to effectuate the objects and purposes of the Article and the public policy of the State thereby declared, any broadening of the statute so as to make it operative beyond the field which it undertakes to cover. See *Franklin v. Franklin,* 1 Md. Ch. 342, 344, holding that remedial statutes are "to be construed liberally to advance the remedy and obviate the mischief," but are "not to be so expanded as to comprehend cases altogether beyond their purview[.]"

*Di Blasio,* 233 Md. at 519–20, 197 A.2d 245.

The *Di Blasio* Court then discussed whether, given that the statute had abolished alienation of affections (and breach of promise) actions, Rezek's allegations in the original complaint as to alienation of affections, would, considering the language of the statute, enjoy any privilege in the defamation case. The Court, after noting that words spoken in litigation must be relevant in order to be privileged, stated:

The authorities which we have referred to earlier in this opinion in considering whether causes of action for criminal conversation have or have not been abolished make clear the close relationship between alienation of affections and criminal conversation. Indeed, the appellant's argument is that the connection is so close that the abolition of the one carried with it the abolition of the other. That the allegations of alienation of affections were ordered to be deleted does not destroy that relationship and hence does not destroy the privilege.

The appellant urges that to uphold the privilege here would circumvent the legislative purpose embodied in Art. 75 C. We note, however, that the Legislature itself has provided sanctions for violation of the statute, which it apparently deemed sufficient and which do not include abolition of the privilege. If the Legislature desires to remove the privilege, it can easily amend the statute.

*Di Blasio*, 233 Md. at 523, 197 A.2d 245 (citations omitted).

The Court of Appeals later abolished the tort of criminal conversation in *Kline v. Ansell*, 287 Md. 585, 414 A.2d 929 (1980). It noted the statutory prohibitions of Chapter 1010 of the Acts of 1945:

An examination of the judicial and legislative history of this cause of action in Maryland shows that in 1945 the Legislature enacted chapter 1010, Laws of Maryland 1945, which abolished, among other things, the cause of action for alienation of affections. That action, which arose when a person induced a married woman to leave her husband or otherwise interfered with the marital relationship, even though no act of adultery was committed, was recognized long ago as separate and distinct from the action for criminal conversation. *See Annarina v. Boland*, 136 Md. 365, 374 [111 A. 84] (1920); *Callis v. Merrieweather*, 98 Md. 361, 363, 365 [57 A. 201] (1904). In 1964, this Court held that the Legislature, assumably aware of our decisions, *Supervisor of Assessments v. Southgate Harbor*, 279 Md. 586, 591–92 [369 A.2d 1053] (1977); *Herbert v. Gray*, 38 Md. 529, 532 (1873), did not abolish the separate and distinct action for

criminal conversation when it abolished the action for alienation of affections. *Di[ ]Blasio v. Kolodner,* 233 Md. 512, 520 [197 A.2d 245] (1964). In 1976, this Court recognized that the husband's action for criminal conversation was related to the State's special interest in the domestic relations of its citizens and remained viable. *Geelhoed [v. Jensen],* 277 Md. [220,] 233 [352 A.2d 818 (1976) ]. As recently as 1977, the Legislature, again assumably aware of our decisions, rejected House Bill 170 which expressly provided that the action for criminal conversation be abolished. *Journal of Proceedings of the Senate of Maryland, Regular Session 1977,* pp. 3034, 3514; *Journal of Proceedings of the House of Delegates of Maryland, Regular Session 1977,* pp. 162, 2397, 2904.

*Kline,* 287 Md. at 590, 414 A.2d 929.

The *Kline* Court, after noting the passage in 1977 of Article 46 of the Maryland Declaration of Rights, Maryland's "Equal Rights Amendment," commented that the action of criminal conversation could only be brought by and against men and therefore any "previous implicit approval by this Court . . . is eradicated." 287 Md. at 593, 414 A.2d 929. The Court then abolished the action.

In *Kline,* the Court there additionally opined as to the reasons for abolishing the action of criminal conversation. These reasons are similar to those given by *several* authorities. for abolishing actions for breach of promise to marry and alienation of affections:

The action for criminal conversation is notorious for affording a fertile field for blackmail and extortion because it involves an accusation of sexual misbehavior. Criminal conversation actions may frequently be brought, not for the purpose of preserving the marital relationship, but rather for purely mercenary or vindictive motives. An award of damages does not constitute an effective deterrent to the act of adultery, and it does not effectively help to preserve or restore a marital relationship in which adultery has already occurred. Indeed, a contested trial may destroy a

chance to restore a meaningful relationship. In addition, this action, which eliminates all defenses except the husband's consent and which imposes liability without any regard to the quality of the marital relationship, is incompatible with today's sense of fairness. Most important, today's sense of the increasing personal and sexual freedom of women is incompatible with the rationale underlying this action. For all of these reasons, this harsh cause of action has been considered to be unreasonable and anachronistic.

*Id.* at 588–89, 414 A.2d 929 (footnote and citations omitted).

The more recent case of *Figueiredo–Torres v. Nickel,* 321 Md. 642, 584 A.2d 69 (1991), was one of the few cases in which the Court permitted an action similar to alienation of affections to be maintained, but only because of a professional relationship upon which the cause could be separately and independently grounded. It involved an action brought for professional negligence against a psychologist who had treated a husband and wife. The husband and wife alleged that Nickel, the psychologist, committed malpractice by advising the husband to be distant from and not to have sexual relations with his wife, while at the same time, Nickel was having sexual relationships with the woman. Nickel argued that the act he had committed was either criminal conversation or alienation of affections, or both and that these causes of action had been abolished in Maryland.[8] Nickel argued that the complaint against him was a mere "refitting of the abolished actions into other forms." Refusing to find the action to be prohibited, the Court of Appeals focused on the professional relationship of the parties that was independent

---

**8.** Ms. Miller argues that cases involving alienation of affections have left the door open to other causes of action that, even if fundamentally arising out of the personal relationship encompassed by the anticipation of marriage, are, nevertheless, viable for other reasons. To some extent, we agree. The professional malpractice case, as we shall see, can be such a case. But the few cases have been carefully limited by factors not present in the case *sub judice.* We discuss this issue further, *infra.*

of Nickel's personal relationship with the wife. The Court noted:

> We do not agree with Nickel's contention that the affair was his private concern wholly separate from his professional practice. *The trier of fact may find it was professional malpractice for a psychologist engaged in marriage counseling to maintain a sexual relationship with his patient's spouse.* See *Mazza v. Huffaker,* 61 N.C.App. 170, 300 S.E.2d 833, 838, *petition for discretionary review denied,* 309 N.C. 192, 305 S.E.2d 734 (1983). We doubt that the standard of care exercised by a reasonable psychologist permits the practitioner to treat a patient in the confines of the office and then undermine that treatment outside the therapy session. . . . At trial, Torres [the husband] should be given the opportunity to establish likewise that a psychologist's duty to his patient does not stop at the office door. *See also Rowe v. Bennett,* 514 A.2d 802, 804 (Me. 1986). . . .
>
> On the surface, the allegations of improper sexual conduct set forth in Torres' complaint may constitute criminal conversation;[9] however, if in addition, the sexual activity violated the professional standard of care which Nickel owed to Torres, it is sufficient to support a cause of action for professional negligence. [Emphasis added.]

*Figueiredo–Torres,* 321 Md. at 650–51, 584 A.2d 69.

We have examined closely and extensively the record forwarded to us for any indication that Ms. Miller's cause of action is based on anything other than her previous personal relationship with Warren Ratner that was, according to the averments of her complaints—made by her applicable to all counts—and her subsequent deposition testimony, based on their "permanent commitment that would be followed by marriage" and "promises . . . [i]n anticipation of their marriage." At one point, a document proffered by her contained her assertion that she and Warren were engaged to be

---

9. The Court had abolished criminal conversion actions prior to this time.

married. We have found no indication of any other fundamental relationship between the parties or other basis for the actions filed.

What appellant attempts to do in this case is similar to what the plaintiff attempted to do in *Gasper v. Lighthouse, Inc.*, 73 Md.App. 367, 533 A.2d 1358 (1987), *cert. denied*, 311 Md. 718, 537 A.2d 272 (1988). That case involved an action by a husband against a marriage counselor, who the husband asserted had caused a divorce by having sexual relations with the husband's wife. The husband sued the counselor and the counselor's employer, Lighthouse, Inc., for breach of their contractual obligation to "help the plaintiff and his wife solve the marital difficulties"; malicious breach of contract; breach of fiduciary duty; two counts of negligence; intentional infliction of emotional distress; malicious interference with the marriage contract of the husband and his wife; and loss of consortium. We noted that the question there before us was whether "a husband can do indirectly what he cannot do directly"—*i.e.*, bring a suit that was, although not in those terms, for alienation of affections and criminal conversation. *Id.* at 370, 533 A.2d 1358. After noting that the abolition of actions for criminal conversation and alienation of affections did not preclude traditional contract and tort actions, we stated:

> What *is* precluded, however, is the refitting of the abolished actions into other forms. One cannot sue to recover for injuries arising from "defilement of the marriage bed" or from an interference with the marriage by simply casting the defendant's conduct as a breach of contract, or negligence, or some other intentional tort. It is *that* kind of sham that the case law prevents. See, in general, *Nicholson v. Han*, 12 Mich.App. 35, 162 N.W.2d 313 (1968); *Destafano v. Grabrian*, 729 P.2d 1018 (Colo.Ct.App.1986); *Goldberg v. Musim*, 162 Colo. 461, 427 P.2d 698 (1967); *Lund v. Caple*, 100 Wash.2d 739, 675 P.2d 226 (1984); *Arnac v. Wright*, 163 Ga.App. 33, 292 S.E.2d 440 (1982); *Harrington v. Pages*, 440 So.2d 521 (Fla.Dist.Ct.App.1983).

*Gasper*, 73 Md.App. at 372, 533 A.2d 1358. After disposing of several of the counts, we looked at the *real* basis for the professional malpractice counts:

> Counts IV and V sound in professional malpractice. Such an action may well lie against a marriage counselor who fails to exercise reasonable care in the performance of his or her calling. See Restatement (Second) of Torts § 299A. But, as with the breach of contract action, we have to examine not merely the form of the action but its real basis. *It is clear from the incorporation of the underlying allegations* and the absence of any other articulated negligence that the sole basis of these actions was Derby's cuckolding activity. It is therefore precluded. *Destafano v. Grabrian, supra,* 729 P.2d 1018. Likewise *Count VI. Lund v. Caple, supra,* 675 P.2d 226, and *cf. Harrington v. Pages, supra,* 440 So.2d 521.

*Gasper,* 73 Md.App. at 373–74, 533 A.2d 1358 (emphasis added); *see also Homer v. Long,* 90 Md.App. 1, 17, 599 A.2d 1193 (affirming trial court's dismissal of negligent misrepresentation and fraud claims brought by nonpatient husband against psychiatrist who was treating husband's wife and having sexual relations with her "because ... the real injury for which recovery is sought is either the adultery or the breakup of the marriage"), *cert. denied,* 326 Md. 177, 604 A.2d 444 (1992).

Likewise, in the case *sub judice,* each and every count contained in appellant's complaints incorporated that her action was, **at least in part,** based upon "a permanent commitment ... followed by marriage" and *"promises"* and that Warren Ratner "[i]n anticipation of their marriage ... would take care of her." For us to reverse the grants of summary judgment in favor of appellees would require this Court to ignore the underlying bases, proffered by Ms. Miller herself, for all of her claims. The statute, by its very terms, was intended to be and is remedial and is to be construed liberally to effectuate that remedial purpose. The Court of Appeals broadly construed provisions of the Intrastate Detainer Act, Md. Code (1957, 1971 Repl.Vol.), Art. 27, § 616S, in the

criminal case of *State v. Barnes,* 273 Md. 195, 328 A.2d 737, *aff'g,* 20 Md.App. 262, 315 A.2d 117 (1974). The Court recognized that the defendant's attorney argued "that the provisions of both the [Interstate Agreement on Detainers Act, Md.Code (1957, 1971 Repl.Vol.), Art. 27, §§ 616A–616R] and intrastate acts are remedial in nature, are in *pari materia,* are identical 'as to purpose and rationale,' and that both should be liberally construed to effectuate the objects of the legislation." 273 Md. at 204, 328 A.2d 737. Although the Court did not entirely agree, it commented:

> Nor do we believe that the failure in § 616S to provide that the statute shall be "liberally construed so as to effectuate its purpose," as is provided in § 616J, is here material since *both statutes at the time of enactment were common in derivation and purpose, were remedial in nature, designed to correct existing law, to redress existing grievances and to introduce regulations conducive to the public good; as such they are to be liberally construed in order to advance the remedy and obviate the mischief.* See Fisher *v. Bethesda Discount Corp.,* 221 Md. 271 [157 A.2d 265] (1960); *Smith v. Higinbothom,* 187 Md. 115 [48 A.2d 754] (1946); *Ordway v. Central National Bank,* 47 Md. 217 (1877).
>
> ... Relating as they both do to the same general subject matter and directed at attaining the same basic results, the provisions pertaining to both interstate and intrastate detainers are in *pari materia* and should be construed together so that they will harmonize with each other and be consistent with their general object and scope. *See Board of Fire Comm'rs v. Potter,* 268 Md. 285 [300 A.2d 680] (1973); *Valle v. Pressman,* 229 Md. 591 [185 A.2d 368] (1962); *May v. Warnick,* 227 Md. 77 [175 A.2d 413] (1961); *Baltimore Transit Co. v. Mezzanotti,* 227 Md. 8 [174 A.2d 768] (1961); *Baltimore Transit Employees Credit Union v. Thorne,* 214 Md. 200 [134 A.2d 84] (1957).

*Barnes,* 273 Md. at 208–09, 328 A.2d 737 (emphasis added); *see also Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 77, 517 A.2d 730 (1986) ("In view of [the statute's] clear remedial

purpose, a liberal construction of the statute is required."
(citation omitted)); *Culotta v. Raimondi,* 251 Md. 384, 389,
247 A.2d 519 (1968) ("There is no impropriety in putting a
liberal construction on a remedial clause...."). *But see In re
Roger S.,* 338 Md. 385, 393, 658 A.2d 696 (1995) ("Even a
remedial statute should not be construed so broadly as to
create ... ' "results that are unreasonable, illogical or incon-
sistent with common sense." ' " (citations omitted)); *Universi-
ty of Maryland Medical Sys. Corp. v. Erie Ins. Exch.,* 89
Md.App. 204, 215, 597 A.2d 1036 (1991) (A remedial statute
should not be interpreted "more broadly than is necessary to
accomplish [its] purpose.").

In a case in which the plaintiff was attempting to extend
loss of consortium claims to persons who were engaged, we
rejected the claim and commented on the prohibition at issue
in the case *sub judice.* Judge Bloom, writing for the Court,
noted in *Gillespie–Linton v. Miles,* 58 Md.App. 484, 496, 473
A.2d 947 (1984):

> We also note that the General Assembly has abrogated
> the right to sue for breach of a promise to marry. Md. Cts.
> & Jud. Proc.Code Ann. § 5–301. "It would be anomalous to
> permit a[n engaged] person to recover for the loss of
> consortium yet deny that same person recovery for the loss
> of those same marital benefits upon the failure to carry out
> the promise of marriage." *Hendrix [v. General Motors
> Corp.,* 146 Cal.App.3d 296] 193 Cal.Rptr. [922,] 924 [ (1983) ]
> (citations omitted). Furthermore, any decision to extend to
> unmarried persons legal rights previously held only by
> married persons would necessitate identifying and weighing
> competing notions of public policy, social mores, and moral
> values. Such a decision is best left to the General Assem-
> bly. "Only the Legislature responsible to the electorate
> should have the power to make such a radical change in the
> fabric of society." *Id.,* 193 Cal.Rptr. at 925 (citation omit-
> ted).

In the present case, the purpose of the statute was exten-
sively presented as a part of it, and thus its purpose—to
abolish actions for breach of promise to marry and alienation

of affections—is not even open to argument. Nor do we have to decipher whether the Legislature intended it to be remedial and liberally construed—it told us so. Were we to be in any way still uncertain, the General Assembly resolved that uncertainty by the unusual (in our view) inclusion in the original statute of a provision preventing anyone from changing it and providing for serious criminal penalties for anyone attempting to circumvent it, penalties that remained as part of the statute until less than eleven years ago. Appellant here would have us restrict that which was clearly intended to be applied broadly. In view of the statute and the cases we have cited, we are bound to apply the statute liberally to ensure that it is not being circumvented by artful pleading and artful framing of other causes of action.

Foreign jurisdictions are generally in accord with the views we have expressed herein and in our prior cases. Several have held that other causes of action were really alienation of affections claims. There are, however, a few cases that directly address breach of promise issues.

Judge Mary F. Spicer, in a poem opinion, stated in *Irvin v. Smith,* 71 Ohio Misc.2d 18, 654 N.E.2d 189 (Ohio Ct.C.P.1993), that the plaintiff, Doris Irwin, had been promised marriage by the defendant, Jimmie Smith, but that

> The Court determines upon proper review That Doris'
> complaint is an amatory action; That the same is barred by
> R.C. 2305.29, And thus denies Doris satisfaction.

*Id.* at 190 (footnote omitted).

Among the other cases we have found directly dealing with breach of promise to marry is *Zaragoza v. Capriola,* 201 N.J.Super. 55, 492 A.2d 698 (Ch. Div.1985). There, the plaintiff, noting that the "defendant continually stated he wished to marry her and provide a family for her daughter and their son," sued defendant and sought *pendente lite* support for herself and the payment of all expenses of the home in which she was living. The court found for the defendant, holding "that any claim predicated upon defendant's alleged failure to live up to his promises of marriage must necessarily fail." *Id.* at 702.

In *Waddell v. Briggs*, 381 A.2d 1132 (Me.1978), parents filed suit on behalf of their minor daughter for breach of promise to marry and infliction of mental suffering. The court noted Maine's statute prohibiting the bringing of breach of promise to marry actions for direct or indirect damages and held that a party "cannot circumvent the statute by suing in tort for fraud or other tortious conduct, instead of bringing an action based on breach of [promise to marry] contract." *Id.* at 1136–37 (footnote omitted).

We have found two cases with unusual factual circumstances in which other tortious actions have been permitted even though promises of marriage existed between the parties. In *Lampus v. Lampus*, 541 Pa. 67, 660 A.2d 1308 (1995), the man, knowing that his prior divorce had been declared invalid, nevertheless, entered into another marriage. Upon his death, the woman discovered that her marriage had been bigamous and asserted claims for breach of promise to marry, and for deceit, negligent misrepresentation, concealment, and negligence. The court upheld the lower court's dismissal of the breach of promise to marry claim but allowed the woman to maintain the remaining counts. The court held that the

> The Heart Balm Act was not intended to preclude an action to recover damages because of a failure to inform a purported spouse of a bigamous marriage, and its specific language cannot be interpreted to abolish causes of action therefor.... The tort claims do not arise from the decedent's failure to marry her, but from the decedent's negligent or intentional conduct in failing to apprise her of the invalidity of the foreign divorce decree.... A claim of tortious conduct which is not based upon an individual's failure to keep a promise to marry is actionable. Only the first count ... was based upon the fracture of the marriage contract; the remaining counts [were] based upon the decedent's conduct after he had fulfilled his promise to marry.

*Id.* at 1311.

A similar case was *Jackson v. Brown*, 904 P.2d 685 (Utah 1995). There, the man was also already married when he

promised to marry the woman. He did not tell her of his married status. Nevertheless, he participated with her in planning the wedding and obtaining a marriage license, but on the morning of the wedding told her he would not marry her— he still did not tell her he was already married. She sued him for breach of promise to marry and for intentional infliction of emotional distress. In Utah, there was no statute prohibiting breach of promise suits. The court then, in essence, abolished the cause of action but preserved what could be termed a right to maintain palimony actions—"losses ... may be recoverable under a theory of reasonable reliance or breach of contract." *Id.* at 687. The court permitted the maintenance of an action for intentional infliction of emotional distress because the man knew he was already married, and thus could not marry the woman when he proposed to her, obtained the marriage license, and planned the wedding. These actions, the Utah court held, might be sufficiently " '... outrageous and intolerable in that they offend ... generally accepted standards of decency and morality.' " *Id.* at 688.

In the case *sub judice,* there was neither evidence, nor averments, that there was any legal impediment to a marriage between Lonnie Miller and Warren Ratner. Nor was there any allegation that when the initial promises in respect to marriage were made, they were not sincere. The case at bar is a pure "change of mind" case. It is exactly that type of case that heart balm statutes are intended to prohibit. Once Warren Ratner conveyed his change of mind to appellant and asked her to leave his house, his subsequent conduct has to be viewed as conduct designed to assert his legal rights to cause her to remove herself from the house.

In both *Lampus* and *Jackson,* the defendants had deceitfully concealed their marital status when they induced the woman to marry, *i.e.,* move in to live with them in anticipation of marriage. Although we do not so hold, such actions may well constitute a deceit that might, even in this State, support a tortious action because a person would fraudulently be caused to change his or her position in reliance on an intentional misrepresentation of the promisor's then present status. It

would not be an action for failure to keep a promise, but an action grounded in deceit and fraud. The first instance, failing to keep a promise to marry, is a breach of promise to marry; the second, making a misrepresentation of one's marital status in order to cause one to change her position may, in some circumstances, constitute the tort of deceit. In any event, the factual situations in *Lampus* and *Jackson* are manifestly inapposite to those facts extant in the case at bar. As to foreign cases that have held that certain claims were in reality prohibited alienation of affections or criminal conversation actions, see *Goldberg v. Musim*, 162 Colo. 461, 427 P.2d 698 (1967) (loss of consortium); *Destafano v. Grabrian*, 729 P.2d 1018 (Colo.Ct.App.1986), modified, 763 P.2d 275 (Colo. 1988) (negligence, intentional infliction of emotional distress); *Harrington v. Pages*, 440 So.2d 521 (Fla.Dist.Ct.App.1983) (emotional distress); *Arnac v. Wright*, 163 Ga.App. 33, 292 S.E.2d 440 (1982) (intentional interference with marriage contract); *Nicholson v. Han*, 12 Mich.App. 35, 162 N.W.2d 313 (1968) (negligence, fraud, battery); *Lund v. Caple*, 100 Wash.2d 739, 675 P.2d 226 (1984) (loss of consortium).

In her argument before the Court, Ms. Miller attempts to assert that, in spite of the averments and testimony as to promises and anticipation of marriage, the promises of support are independent grounds for maintaining a breach of contract action. We initially note again that nonmarital partners can certainly be subject to suit for promises made independent of promises to marry so long as the actions are not shams intended to circumvent the actions prohibited by statute. Actions to establish constructive or resulting trusts, in replevin, for conversion, to enforce purchase agreements are a few that come to mind.[10] Additionally, there is what has come to

---

10. In *Gikas v. Nicholis,* 96 N.H. 177, 71 A.2d 785 (1950) that court permitted an action to recover an engagement ring. The court noted that in prohibiting breach of promise suits, the Legislature had not intended "to permit the unjust enrichment" of a party. The court limited its holding to engagement rings. That view, that actions can be maintained to recover engagement gifts, also finds support in several older cases: *Norman v. Burks,* 93 Cal.App.2d 687, 209 P.2d 815 (1949);

be termed as a "palimony" action, which may also incorporate some of those specific actions we have just noted. Although we do not here decide, such an action, under appropriate circumstances, may be maintainable in this State.

We shall briefly discuss the distinction between actions involving unmarried companions that do not violate the prohibition by discussing two cases involving palimony-type actions beginning with the most famous, although not the first, California palimony case—*Marvin v. Marvin*, 18 Cal.3d 660, 134 Cal.Rptr. 815, 557 P.2d 106 (1976).[11] The accepted facts in *Marvin* did not include allegations of promises to marry or promises in anticipation of marriage. In fact, one of Lee Marvin's arguments on appeal was that because Michelle was claiming that Lee had promised to support her and to pool property, the action was so similar to a breach of promise to marry that it should be prohibited even if no promise to marry had been made. At the time the parties agreed to live together, the defendant, Lee Marvin, was already married to somebody else. Under the posture of that case, certain facts were accepted. They included that the parties entered into an oral contract that provided that while they lived together, "they would combine their efforts and earnings and would share equally" in any property acquired during that period. *Id.* at 819, 557 P.2d at 110. The contract also provided that they would hold themselves out to the public as husband and wife and that the plaintiff, Michelle, would be Lee's "companion, homemaker, housekeeper and cook." *Id.* The plaintiff agreed to give up her career, and Lee was to provide for her "financial support and needs for the rest of her life." *Id.* There was no allegation of any promise to marry or of any

---

*De Cicco v. Barker*, 339 Mass. 457, 159 N.E.2d 534 (1959); *Beberman v. Segal*, 6 N.J.Super. 472, 69 A.2d 587 (Law Div.1949).

11. *Trutalli v. Meraviglia*, 215 Cal. 698, 12 P.2d 430 (1932), and *Vallera v. Vallera*, 21 Cal.2d 681, 134 P.2d 761 (1943), mentioned in *Marvin, supra*, appear to be the initial California palimony cases. Additionally, there are numerous pre-*Marvin* California cases permitting nonmarital partners to enforce contracts for the distribution of property.

anticipation of marriage when the parties entered into the agreement.

*Kozlowski v. Kozlowski,* 80 N.J. 378, 403 A.2d 902 (1979), was a palimony action in which the New Jersey court approved breach of contract actions between adults who contract to live together so long as the contract is in no way based upon a promise to marry. The man in that case, when asking the woman to live with him,[12] "made it clear that he did not intend to marry her." *Id.* at 905. "She moved back into the house ... knowing that he refused to take steps toward marriage." *Id.* The court, in upholding the trial court's decision, noted that "society's mores have changed ... an agreement between adult parties living together is enforceable to the extent it is not based ... on a promise to marry." *Id.* at 908.

In respect to such actions, we perceive an inherent difficulty in maintaining a palimony action in this State when a plaintiff concedes that the relationship was based on promises and commitments to marry or in anticipation of marriage, even though the cases discussed in *Attorney Grievance Comm'n v. Ficker,* 319 Md. 305, 316–23, 572 A.2d 501 (1990), and *Unitas v. Temple,* 314 Md. 689, 701 n. 6, 552 A.2d 1285 (1989), do not foreclose the possibility of such actions. In light of Maryland's statutory prohibition, however, a complaint, in order to survive a motion for summary judgment, will have to be carefully framed, based upon proper and supportable allegations, and devoid of factual circumstances implicating the applicability of section 3–102 of the Family Law Article.

 The palimony cases that we have examined have one thing in common. They exist in a factual precis that is completely free of any taint of a breach of promise to marry. So long as persons initiate and maintain their relationships based upon promises of marriage, and its anticipation, rights arising out of those promises or agreements cannot escape the

---

12. They had previously lived together, broken up, and he then asked her to move back in. The case involved *only* the second arrangement.

bar by being recast as agreements between nonmarital part-
ners. That is not to say that if the agreement to marry is
terminated and the relationship either continues or recom-
mences, as in *Kozlowski,* under a new agreement, in which no
promises to marry are made and which does not anticipate a
marriage, that a contractual action might not be sustainable.
Moreover, while we do not so decide, it is not difficult to
surmise that breach of contract actions between nonmarital
partners completely free of promises in anticipation of mar-
riage, might also be viable. In either case, it might be
necessary, under the facts of a given case, to address the issue
of meretricious sexual services. In some states, that issue has
become *de minimis,* but it is unclear which direction Mary-
land will take on this issue. As we indicate elsewhere, we
need not concern ourselves in this case with whether the
promises here made also contemplated meretricious conduct.

We shall accept what we perceive to be the dictates of the
statute (considering its history), the mandate of Maryland's
alienation of affections cases, persuaded by the weight of the
law elsewhere, and liberally construe this remedial statute to
insure that no proscribed actions are maintained in Maryland,
whether attired in the full raiment of the prohibited action or
disguised as another type of action. We have earlier re-
marked that in each and every count of Ms. Miller's complaint,
she specifically averred that she moved into Warren Ratner's
house and began her relationship with him because the two of
them were "making a permanent commitment that would be
followed by marriage" and that she "relied upon the defen-
dant's promises ... [i]n anticipation of their marriage."
Moreover, she stated elsewhere that they were engaged to be
married. We perceive that these statements, considering the
strong public policy of this State, would be sufficient, under
the circumstances here present, to constitute a claim for
breach of promise to marry and that would be barred.[13]
There are additional undisputed facts that support our posi-

---

13. We do not mean to say that the absence of such averments would
alone have saved appellant's causes of action.

tion and make it even more clear that the real cause of action here presented is statutorily barred.

Appellant, while being questioned by Warren Ratner's counsel, stated in deposition:

[MR. BRAULT:] ... I want to make sure I understand, is it your contention that there was a suggestion to the point that you felt that there was an agreement that Mr. Warren Ratner would marry you?

[APPELLANT:] We did have an agreement.

[MR. BRAULT:] That agreement was to marry?

[APPELLANT:] Yes.

[MR. BRAULT:] ... [Y]ou, in addition, had an agreement that he would support you financially into the future?

[APPELLANT:] Yes....

[MR. BRAULT:] ... [W]as that regardless of marriage?

[APPELLANT:] Regardless.

[MR. BRAULT:] And to what extent did you understand that he was to support you?

[APPELLANT:] Well, he had a prenuptial drawn up.[14]

. . . .

BY MR. BRAULT:

Q. You moved in because you felt you had a commitment for your future support and to marry you in the future?

A. Yes.

Q. Did you discuss a date for the marriage or place for the marriage?

A. Warren had discussed with me and many friends that he wanted to surprise me and we would get married on the 19th of some month, and he said it was going to be a surprise.

---

14. A prenuptial agreement is an agreement entered into in anticipation of marriage.

Q. So when you moved in you had no specific date on which the marriage was to occur?

A. No, we were just working towards learning about each other and planning for a future.

In *Lewis v. State*, 71 Md.App. 402, 406, 526 A.2d 66 (1987), Judge Alpert, for this Court, quoted Lord Brougham, from Wellman, *The Art of Cross Examination* 21:

> The issue of a cause rarely depends upon a speech and is but seldom even affected by it. But there is never a cause contested, the result of which is not mainly dependent upon the skill with which the advocate conducts his cross-examination. [Footnote omitted.]

Mr. Brault's cross-examination[15] did what effective cross-examinations are designed to do. It elicited truth. Although Ms. Miller now argues that the issues here present are not based on a breach of promise to marry, she previously asserted otherwise. All her complaints, in every count, assert, at least in important part, that her grievances arise out of promises of and in anticipation of marriage—a marriage that, because of Warren Ratner's change of heart (or mind), did not occur. She also testified in deposition that the arrangement between her and Warren was an arrangement in contemplation of marriage based upon a promise to marry.

Upon our review of Ms. Miller's averments when the motions for summary judgment were granted, the alleged atrocious actions of Warren and Dennis did not occur until Warren Ratner had terminated the relationship and ordered Ms. Miller to leave his house, and she refused to leave. Thus, not only was their relationship based upon their promises in anticipation of marriage, the unilateral termination was a rejection (a breach) of those promises and a nullification of the anticipation of the parties. It could not be more clear.

The emotional distress appellant alleges she suffered resulted from the breaching of Warren Ratner's promise to

---

15. Mr. Brault apparently took the deposition of appellant. Accordingly, he cross-examined her as an adverse party.

marry her and his attempts at terminating their relationship and evicting her from the house. The mental distress counts are therefore fatally tainted with the ramification of the prohibited breach of promise action. They, likewise, under the circumstances here present, cannot be maintained.

We hold, therefore, that all of the claims, save one, which we shall later address, are barred by section 3–102(a)(1) of the Family Law Article. Given the clear dictates of the statute, its stated purposes, its remedial nature, its liberal interpretation clause, its initial inclusion of criminal penalties and prohibitions against circumvention, and the statutory provision that still provides that even settlement agreements of claims based upon breach of promise to marry are void and unenforceable, and in consideration of the case treatment of similar statutory prohibitions both in this State and in other states as well, no other conclusion is appropriate.[16]

We shall, therefore, at this point, affirm the trial court's granting of judgment in favor of appellee as to all counts of the various complaints, except as to the tortious interference

---

**16.** This statute is over fifty years old. The world of female/male relationships and gender issues in all areas of our society may have changed more in the last thirty years than in America's prior history. The state of marriage as an essential element of our society may or may not be considered as fundamentally important now as in prior times. Where it will finally settle, if it does, remains generally unclear. Living arrangements of many kinds continue to evolve. While controversial efforts are being made elsewhere to reclassify marriage, lesser changes may be more appropriately functional. Moreover, there may be a need to consider the feasibility of providing methods for people who are not marriage partners to be able to present certain of their conflicts to the courts.

These statutory prohibitions we construe today apply to the marriage relationship, *i.e.*, a man and a woman who have promised to marry or are married. Thus, other parties in other arrangements, including parties who cannot legally marry, may effectively be able to avoid the prohibitions, which in turn would conceivably confer rights to them that those who can legally marry do not have. If two parties cannot legally marry, and they know it, a breach of promise between them might not logically be a present breach of promise to marry. It is not our function (thankfully) to consider those issues best addressed by the people's direct representatives, the Legislature.

with prospective advantage count, which we shall address separately. We further explain.

▇ All of the counts alleging breach of contract and intentional infliction of emotional distress were based upon Warren Ratner's attempt to terminate the relationship that we have found was based in major part on a promise to marry and in anticipation of marriage. Dennis Ratner's conduct, by itself, although, if true, is reprehensible, does not independently satisfy the elements of the torts. To the extent it is based on his attempt to help his brother terminate the relationship, it may come under the broad ambit of the prohibition. We note that appellant's count for civil conspiracy related to the infliction of severe emotional distress count and that appellant stated therein that the actions taken that caused her such distress were done by Dennis Ratner and Warren Ratner "together, [so that] they could cause the Plaintiff to leave the home that she had been living in with Defendant Warren Ratner for almost three (3) years." Appellant alleged no possessory or ownership-based right to occupy the property; she relied *solely* on her relationship with Warren Ratner. However vile and repugnant the Ratner's actions were, if true, Warren Ratner nevertheless had the legal right to ask her to leave and to cause her to leave. That his brother helped him to do what he had a right to do does not create any separate action against Dennis Ratner for intentional infliction of emotional distress.

▇ Even if we did not hold that appellant's claims for intentional infliction of severe emotional distress are fatally tainted with the breach of promise aspect of her case, we would nevertheless sustain the trial court's judgment on those counts. We explain.

In *Kentucky Fried Chicken Nat'l Management Co. v. Weathersby*, 326 Md. 663, 607 A.2d 8 (1992), the plaintiff-employee alleged that she was "treated so outrageously" that the defendant-employer should have been held accountable for intentional infliction of emotional distress. This Court reversed the trial court's grant of the employer's motion for

judgment notwithstanding the verdict. We noted that the employer and its managers " 'were in a unique position to know ... that their conduct could have impacted significantly and detrimentally upon her.' " *Id.* at 665, 607 A.2d 8. We were, in turn, reversed by the Court of Appeals.

The plaintiff, Weathersby, claimed that her regional manager, Watts, harassed her after she complained to the company that Watts and an assistant manager of the store in which Weathersby worked were engaged in a prohibited romantic relationship. She was made to work fifteen straight days, ordered to put a promotional banner on top of the Wheaton store singlehandedly, phoned on her day off, and assigned substandard assistant managers. When an apparent theft was discovered, she was required to take a polygraph test over her objection. Thereafter, she met with Watts and the employer's regional security director, and she told the security director that Watts knew that the locks had not been changed and that Watts had engaged in a prohibited romantic arrangement with her store's assistant manager. Thereafter, at a manager's meeting, in front of other employees and customers, Watts took away Weathersby's store keys and suspended her for ten days without pay pending an investigation of the missing money. Watts thereafter demoted Weathersby for "serious misconduct." Two days later, Weathersby sought psychiatric help and ultimately was hospitalized.[17] As we have indicated, the Court of Appeals reversed us holding that the conduct alleged was not sufficiently atrocious to be a basis for maintaining the tort. The *Weathersby* majority referenced its then recent case of *Batson v. Shiflett*, 325 Md. 684, 602 A.2d 1191 (1992), for a discussion of the elements of the tort.

*Batson, supra,* was a case that involved a labor dispute in which a national union and its president were sued for defamation and intentional infliction of emotional distress. Shiflett,

---

17. Ms. Miller's physical health problems—cancer—did not result from the Ratner's conduct. It predated the actions here complained of and appears to have been at least one of the factors causing that alleged conduct.

the president of a local union, alleged that the national union's president, during a representation dispute, distributed leaflets to union members that accused Shiflett of trying "to steer your attention away from their crimes of conspiracy, perjury, falsification of records, illegal contract ratification." *Id.* at 694, 602 A.2d 1191. At the same time, the national union claimed that Shiflett had misused the local union's petty cash, received double reimbursements, used the local union's money for personal use, and even misappropriated food donation funds. In another flyer, Batson accused Shiflett of being a "crook," and accused him of lying and committing perjury. Batson also met with Shiflett's employer and told it that Shiflett would be immediately removed from office for embezzlement and misappropriation.

In resolving the issue, the Court of Appeals first noted the tort's elements:

> To establish a cause of action for intentional infliction of emotional distress, four essential elements are necessary:
>
> "(1) The conduct must be intentional or reckless;
>
> (2) The conduct must be extreme and outrageous;
>
> (3) There must be a causal connection between the wrongful conduct and the emotional distress;
>
> (4) The emotional distress must be severe."

*Id.* at 734, 602 A.2d 1191 (quoting *Harris v. Jones*, 281 Md. 560, 566, 380 A.2d 611 (1977)). It then continued:

> All four elements must be shown. We have acknowledged that " '[i]n developing the tort of intentional infliction of emotional distress, whatever the relationship between the parties, *recovery will be meted out sparingly, its balm reserved for those wounds that are truly severe and incapable of healing themselves.*'" *Figueiredo–Torres v. Nickel*, 321 Md. 642, 653 [584 A.2d 69] (1991) (quoting *Hamilton [v. Ford Motor Credit Co.*, 66 Md.App. [46,] 61, 502 A.2d 1057 (1986) ] ).

For conduct to meet the test of "outrageousness," it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and

utterly intolerable in a civilized community." *Harris,* 281 Md. at 567 [380 A.2d 611] (quoting Restatement (Second) of Torts § 46 comment d (1965)). Whether the conduct complained of meets this test is, in the first instance, for the court to determine; in addressing that question, the court must consider not only the conduct itself but also the "personality of the individual to whom the misconduct is directed." *Harris,* 281 Md. at 568 [380 A.2d 611]. This high standard of culpability exists to screen out claims amounting to "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" that simply must be endured as part of life. *Id.* at 567 [380 A.2d 611] (quoting Restatement (Second) of Torts § 46, comment d (1965))....

We have upheld claims for intentional infliction of emotional distress only three times and only in cases which involved truly egregious acts. See *Figueiredo–Torres v. Nickel,* 321 Md. 642 [584 A.2d 69] (1991) (psychologist had sexual relations with the plaintiff's wife during the time when he was treating the couple as their marriage counselor); *B.N. v. K.K.,* 312 Md. 135 [538 A.2d 1175] (1988) (physician did not tell nurse with whom he had sexual intercourse that he had herpes); *Young v. Hartford Accident & Indemnity,* 303 Md. 182 [492 A.2d 1270] (1985) (worker's compensation insurer's "sole purpose" in insisting that claimant submit to psychiatric examination was to harass her and force her to abandon her claim or to commit suicide).

*Batson,* 325 Md. at 734–35, 602 A.2d 1191 (emphasis added; some citations omitted).

The three cases cited by the Court in *Batson*—involving (1) a psychiatrist's sexual relations with a wife at the same time he was providing marriage counseling to the couple; (2) a doctor's failure to disclose to a nurse with whom he was having sexual relations that he had an incurable sexually transmitted disease; and (3) an insurer's "sole purpose" in requiring a claimant to undergo a psychiatric examination was to harass her and force her either to abandon her claim or to

commit suicide—are all, as we perceive them, more repugnant than what occurred here.

The verbal language directed to Ms. Miller, and the conduct was solely verbal, although it included threats, was for the purpose of pressuring appellant to leave Warren's house, where, regardless of the morality of his position, she had no legal right to remain. Considering that the appellees had the legal right to require appellant to leave, we do not perceive their verbal actions alone to be, as nauseating as they are if true, of such egregiousness so as to satisfy the elements of the tort. Accordingly, had we not sustained the trial court's judgment on this issue for the reasons we earlier stated, we would affirm it for this reason.[18]

Because we have based our decision on the statutory prohibition against breach of promise actions and appellant's failure to meet the essential elements of the tort of intentional infliction of emotional distress, we shall not address appellees' alternate argument that the alleged contract was based upon an "illicit sexual" relationship. We are, therefore, spared the necessity of entering that jungle to determine what, in 1997, remains illicit or is meretricious.[19]

We shall also affirm the trial court's granting of summary judgment against appellant on her count alleging tortious interference with prospective advantage. We initially note that in our resolution of this issue, we may not consider the deposition testimony of appellees because the relevant depositions were not properly admitted below and were not in evidence. The testimony is not a part of the lower court's

---

18. The allegations as to Warren Ratner filing a claim in her bankruptcy matter does not, in and of itself, under the cases we have described, constitute a sufficient basis for the maintenance of a claim for intentional infliction of emotional distress, although it might constitute grounds for other types of relief not presented in the case at bar.

19. The *Random House Dictionary of the English Language* 897 (unabr. ed.1983) defines "meretricious" as "alluring by a show of flashy or vulgar attractions; ... based on pretense, deception, or insincerity ... pertaining to or characteristic of a prostitute."

record nor a part of the record on appeal. We shall discuss some limited facts necessary to the resolution of this issue.

A business called The Hair Cuttery was, according to appellant, owned by "Creative Hairdressers." Appellee, Warren Ratner,[20] according to Ms. Miller, was the "vice president of Creative Hair Dressers." Appellant alleged that Warren "willfully and intentionally interfered with [her] prospective advantage by telling [appellant's] employer that The Hair Cuttery would not consummate the contract with [her employer] if [she] would benefit financially from such contract."

Judge Motz, for this Court, in *Bleich v. Florence Crittenton Serv., Inc.,* 98 Md.App. 123, 632 A.2d 463 (1993), discussed the intentional interference with contractual relations claim advanced by the plaintiff, Ms. Bleich. Judge Motz noted:

> Ms. Bleich alleges that Ms. Davis acted with "malice, hatred, spite, evil motive, and ill will for the principal purpose and with the deliberate intention of wrongfully injuring" Ms. Bleich. It is not alleged that Ms. Davis did not act within the scope of her authority as Executive Director of FCS or contrary to the interests of FCS in firing Ms. Bleich. (Nor did Ms. Bleich offer any evidence of this.) . . . .
>
> . . . .
>
> . . . The *Fuller* court noted that in order to make out such a claim, a plaintiff had to allege that the corporate officers acted out "of personal motive *and without intent to further the interests of their [corporate] principal.*" *[George A. Fuller Co. v. Chicago College of Osteopathic Medicine],* 719 F.2d [1326,] 1333 [ (7th Cir.1983) ] (emphasis added); *see also Sullivan [v. Heritage Found.],* 399 A.2d [856,] 861 [ (D.C.1979) ] (finding summary judgment on claim for a tortious interference with business relationship proper because plaintiff offered no evidence that corporate officer's conduct, even if motivated by malice, *was contrary to some*

---

**20.** This claim was asserted against Warren Ratner in the first Amended Complaint when only he was a defendant. Upon our examination of the various amended complaints in the extract we have not found where Dennis Ratner was added as a defendant in respect to this count.

*"legitimate business purpose"); Yaindl [v. Ingersoll–Rand Co.*, 281 Pa.Super. 560*], 422 A.2d [611,] 619 & n. 8 [ (1980) ]* (if employee "acted *solely* for his personal benefit" in effecting the discharge of another corporate employee, he would be liable) (emphasis added).

Here, Ms. Bleich has alleged that Ms. Davis acted with malice and for her own motives *but has utterly failed to allege that Ms. Davis's actions were not within the scope of her authority or "without the intent to further the interests of her [corporate] principle."* For these reasons, Ms. Bleich has not stated a cause of action for tortious interference with business relationship against Ms. Davis.

98 Md.App. at 146–48, 632 A.2d 463 (some emphasis added).

In the case *sub judice,* appellant alleged that appellee, Warren Ratner, was a corporate officer of the entity that owned The Hair Cuttery. While she alleged that he acted for personal reasons, she failed to assert that he acted outside the scope of the duties of his official position with the entity that owned The Hair Cuttery or even that he acted contrary to the interests of his corporate employer and/or principal. Because she did not allege the essential elements of the tort, as required by our holding in *Bleich,* the trial court neither erred nor abused its discretion in granting judgment in favor of appellee Warren Ratner, on this count.[21]

---

**21.** Ms. Miller clearly knew of Warren Ratner's connection with the corporate entity that owned The Hair Cuttery, and, for that matter, with The Hair Cuttery itself. At the time she attempted to do business with that entity, the animosity and alleged atrocious conduct was clearly extant. She had been forced from Warren's house and his life. Nevertheless, she then attempted to do business with his business (The Hair Cuttery apparently was one of several franchised operations known by appellant to be owned or controlled by Warren). Under the circumstances, had appellant alleged that he had acted outside the scope of his position, we would be hard pressed to agree. With the animosity then present, Warren, no matter how repulsive his actions, if true, were, may well have breached his duty to protect the corporate interests of the corporation had he permitted the subordinate entity to enter into a business arrangement with such a bitter (perhaps with great cause to be so) antagonist. We do not, however, decide this issue in view of our holding aforesaid.

## Resolution

We shall affirm. The primary basis for our affirmance is the statute itself, its stated purpose, its remedial nature, and the history of its original passage and subsequent reenactments. We note, however, that we, as judicial officers, do not approve of the actions, if true, allegedly committed by appellees. We have no way of knowing whether the allegations are accurate. We also recognize the great harm that can be done to a person falsely accused of such actions.[22] For purpose of this review, we were required to presume that Ms. Miller's assertions were true. Moreover, we are reminded that

> [j]udicial power is never exercised for the purpose of giving effect to the will of the Judge; always for the purpose of giving effect to the will of the Legislature; or, in other words, to the will of the law.

*Osborn v. Bank of United States,* 22 U.S. [9 Wheat.] 738, 866, 6 L.Ed. 204 (1824).

We have reviewed the record relative to appellees' motion under Maryland Rule 8–501(e) for costs in respect to matters that appellees deemed necessary and that were included in appellees' appendix. We perceive that they were, in fact, necessary and should have been included in the extract provided by appellant. As we shall direct appellant to pay all costs, appellees' costs of including such matter in their appendix will necessarily also be appellant's responsibility. We perceive no need for a separate order.

We affirm.

**JUDGMENT AFFIRMED; ALL COSTS TO BE PAID BY APPELLANT.**

---

22. The difficulty in determining the truthfulness of such statements was one of the reasons that the cause of action was abolished fifty years ago.